## LAMB v. INTERSTATE S. S. CO. et al.

### PAUL v. SAME (two cases).

### PAUL v. GREAT LAKES TOWING CO. et al.

Nos. 452–454; Civil Action No. 4870.

District Court, N. D. Ohio, W. D.

June 13, 1944.

Edward Lamb, of Toledo, Ohio, for plaintiffs.

Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, for Interstate Steamship Co.

McKeehan, Merrick, Arter & Stewart, of Cleveland, Ohio, for Great Lakes Towing Co.

WILKIN, District Judge.

These cases were consolidated for trial. They all arose from the same facts and are controlled by the same law. By stipulation the question to be determined is whether or not the impleaded respondent, Interstate Steamship Company, is liable.

The libellants seek damages for the death of their respective decedents who were drowned when the tug America sank in the Detroit River in the early morning hours of October 23, 1941. It was conceded that the right to recovery depended on a showing of negligence on the part of the re-

spondent. The decedents were employees of the Great Lakes Towing Company, an independent contractor. The masters of the tugs were in control of their own craft, and the impleaded respondent, Interstate Steamship Company, could not be held accountable except upon proof of negligence on its part. While, as stated in the brief of the libellants, the two respondents were engaged in a mutual operation or a cooperative effort, it was not a joint venture such as would impose liability upon both if one were negligent.

█ The Great Lakes Towing Company had been engaged to assist in getting the freighter B. F. Jones off strand. At the time the accident happened the two tugs (America and Oregon) were pulling on the anchor chain of the B. F. Jones in an attempt to release the anchor so that the freighter could lift the anchor. The tugs had been pulling in tandem formation, with the Oregon in the lead. They had been operating upstream and then changed to a downstream operation. At the time of this change the tugs surged forward at a rapid speed and were brought to a sudden halt. The tow line of the Oregon was attached to the pawl post of the America and the tow line of the America was attached to the anchor chain. When the anchor would not yield and the slack was all out of the anchor chain and the tow lines, the tendency and pressure of the operation was to create a straight line from the anchor to the Oregon and to bring the intervening America into alignment. Evidently because of the position of the America this tension caused her to "heel" or submerge at the stern and also to list to the port side. The result was that the America capsized suddenly, with the loss of seven of her crew.

The crux of the dispute arose from the effort to determine what caused the surging ahead of the tugs. There was no positive proof on the subject. Counsel for the libellants contended that the anchor chain had been "paid out" from the B. F. Jones. It was the contention of counsel for the impleaded respondent, however, that the slack which had allowed the tugs to surge ahead was in the tow lines rather than in the anchor chain and that this slack in the tow lines had been occasioned by the shift in operations.

The libellants supported their contention by the opinion evidence of two witnesses. The impleaded respondent supported its contention by the positive statement of the men operating the anchor chain that no chain had been "paid out," or, at any rate, not sufficient to permit the tugs to surge ahead.

In view of this testimony the court is constrained to find in accordance with the positive statement of the witnesses rather than the opinions of the other witnesses. Not only is the inference of the libellants denied by the testimony, but other inferences from all the facts seem just as plausible. The tow line may have slipped along the anchor chain, or the tow line itself attached to the anchor chain may have gathered some slack in the shift from upstream to downstream operation.

█ There was strong evidence to the effect that tandem operation by the tugs was a dangerous method. If so, the Interstate Steamship Company cannot be held accountable for that because the masters of the tugs had adopted that procedure. After the tugs had been pulling on the anchor chain for some time, there is evidence that "The captain of the Oregon came out with orders for us to give another pull on the anchor," and it might be inferred from all the testimony that such orders were the result of a conference between the captain of the Oregon and the captain of the B. F. Jones. But there is nothing to show that the captain of the B. F. Jones ordered tandem pulling. On the other hand, there is testimony that the captain of the B. F. Jones proposed lifting the anchor by lighter and bringing it into the freighter. A careful consideration of all the testimony fails to produce the required proof of negligence on the part of the Interstate Steamship Company to impose liability for the unfortunate disaster. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; New York Cent. R. Co. v. Ambrose, 280 U.S. 486, 50 S.Ct. 198, 74 L.Ed. 562 (syl. 2); Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819 (syl. 2); Tennant v. Peoria & Pekin U. R. Co., 321 U.S. 29, at page 32, 64 S.Ct. 409.

Finding and judgment for impleaded respondent, Interstate Steamship Company.