[Civ. No. 25215.   Second Dist., Div. One.   Dec. 19, 1961.]

DELFIN CORDOVA, Plaintiff and Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant and Appellant.

Parker, Stanbury, Reese & McGee, Robert W. Walker and J. H. Cummins for Defendant and Appellant.

Belli, Strong, Ashe & Gerry and William Strong for Plaintiff and Respondent.

WOOD, P. J.—This action, commenced under the Federal Employers' Liability Act, is for damages for personal injuries (burns) resulting from an explosion of cleaning fluid while plaintiff, who was in the refrigerator-motor room of a refrigerator car, was cleaning the room and motor by applying the fluid with an air-pressure spray gun. Judgment, pursuant to a verdict, was for plaintiff for $60,000.

Defendant appeals from the judgment and an order denying its motion for judgment notwithstanding the verdict.

Appellant contends that there is no evidence that appellant was guilty of negligence proximately causing the injuries; and that the amount of the verdict is excessive as a matter of law.

The refrigerator-motor room is a partitioned end portion or section of a refrigerator car, which portion or section extends the width and height of the car and extends lengthwise of the car a distance of approximately 7 feet. The motor and other refrigeration equipment occupy most of the space in the room. The entrance door of the room is at the side of the car.

The spray gun which plaintiff used was made by defendant and may be described generally as an "L-shaped" metal ½-inch pipe, with an air hose and an "open and close" valve attached to the handle portion of the gun, and with a "fluid" hose attached to the side of the nozzle. The nozzle was about 9 inches long; and the handle portion, which was about 6 inches long, was attached to the nozzle by a right-angle pipe elbow. The air hose, about 50 feet long, was attached to the end of the handle portion of the gun, and the other end of the hose was attached to a compressed-air tank outside the car. The "fluid" hose, about 10 feet long, was attached to the side of the nozzle portion, and the other end of the hose was in a bucket of cleaning fluid which was on the floor of the car. The valve for turning the spray on and off was in the handle portion. When the valve was open, the compressed air passing through the nozzle drew the cleaning fluid from the bucket and discharged it in the room in "atomized" or spray form.

Plaintiff, who was 57 years of age at the time of the accident, had been an employee of defendant about 40 years, and during the past 8 years he had been employed as a laborer in the railroad yards at Barstow. Since 1954 he had been cleaning refrigerator rooms and motors in refrigerator cars. From the time he commenced such cleaning work and continuing until the fall of 1956, he performed the work by using a spray gun (similar to the one above described) and a flammable cleaning fluid known as "spirits," which is a petroleum solvent containing 3 to 5 per cent carbon tetrachloride. During that period of time, defendant kept the spirits in barrels near the railroad track where the refrigerator cars were cleaned and

serviced. In the fall of 1956 defendant installed a 450-gallon tank near the service track and thereafter kept a soap solution (also referred to as "Oakite") therein. An underground pipe which was connected with the tank conveyed the soap solution to faucets at various places near the service track. After the tank and pipe were installed, the barrels which had contained spirits were removed from the yard, and the assistant roundhouse foreman told plaintiff to use the soap solution for cleaning the cars. After the barrels which had contained spirits had been removed, the defendant installed a 55-gallon "drum" of spirits at a place in the railroad yard about 65 feet from the place where the barrels had been located. The accident occurred on July 7, 1957.

Plaintiff testified, in part, as follows: He was a member of a crew of workmen consisting of an electrician, a machinist, and another laborer. The machinist is the one who gave work orders to plaintiff. On July 7, 1957, the day of the accident, he arrived at the machinist's shack about 2:40 p. m. (about 20 minutes before time for commencing his work shift) and asked the machinist where he (plaintiff) should work. He replied that plaintiff should start with the car at the east end of the track (which was the car involved here). Plaintiff picked up a spray gun, which was on the ground near the service track, and went to a place near the car where he heard a "buzz" in the car. He called the attention of the machinist to the sound and asked him, "What's the matter with that car?" He replied, "That's the electrician's trouble. I [will] call him and we'll fix it up." They (machinist and electrician) entered the car, while plaintiff waited outside. While he was waiting there, another laborer (Miranda) got a "bucket of fuel" from the drum (spirits drum). Then, while plaintiff and Miranda were waiting outside the car, plaintiff heard one of the men (in the car) say: "Let's put a cardboard behind the buzzer." When the men (machinist and electrician) came out of the car, plaintiff asked if it would be all right for them (plaintiff and Miranda) to do their work. They said, "Okey," and then they went back to the shack. After putting the bucket and spray gun into the car, plaintiff entered the car. At that time he did not hear any buzzing. He put the end of the hose in the bucket, opened the spray valve, and started to spray the floor. When the spray hit the floor, a ball of fire came from under the motor and "got me [him] afire," and "caught fire on his shirt" and started burning his pants. He shut off the spray valve, fell out of the car,

started running, and called for help. Some one grabbed him, rolled him on the ground, and put out the fire.

With reference to the use of spirits or the soap solution (Oakite), plaintiff testified (at the trial) that prior to the time the Oakite was ready to use in cleaning the motors, he had used spirits about three years for that purpose; the Oakite came there, or was ready to use, about three weeks or a month before the accident; at the time they were instructed to start using Oakite, the spirits were still there, and Mr. Smith told him that they were going to take the spirits away and that plaintiff would have to use the Oakite; defendant took the spirits away, and he (plaintiff) used "the Oakite for that length of time"; he "used the spirits again when they brought them back"; no one said anything to him about using the spirits again; the reason he used the spirits again was that when he came back from his days off (Thursday and Friday off) the other laborers were using it and he began using it; he did not ask any questions; it was the same kind of spirits that he had used before; after he returned from his days off, he used the spirits about a week (week preceding the accident).

In plaintiff's deposition he stated that he had used the spirits about two years; after that, Oakite was available, but he did not use it until approximately three weeks thereafter when Mr. Smith ordered them to use it; Mr. Smith said to go ahead and use the chemical that runs through the pipe because they (laborers) were not going to have any more spirits—they were going to take the spirits away; he (plaintiff) had orders to use soap; on the day of the accident he did not use soap; no one had given an order not to use soap; he did not object to using the soap; he discontinued using the soap because he saw, after he came back from his day off, that the other two laborers who worked with him were using "it" (spirits), and "they just went out and got the spirits"; he did not "know who gave them orders"—he did not ask that; he saw them using it, and he "went back to using it"; he did not try to get soap out of the pipe on the day he came back; he did not know whether or not the pipe was full of soap on that day—he was off two days and "when this boy went and got the spirits, I just went to use it," that "is all."

Plaintiff testified further (at the trial) that when he and the other laborers first used the Oakite, they did not use the same kind of spray gun which they had used for the spirits—they put the Oakite in a compressed-air tank; the defendant stopped using the tanks "because it would take two men to carry

them"; thereafter the laborers used the kind of spray gun for the Oakite that they had used for the spirits.

Mr. Miranda, called as a witness by plaintiff, testified: He had been a laborer-employee of defendant about seven years. During the month preceding the accident, it was his duty to put water in switch engines and to help clean the motors in refrigerator cars. He and plaintiff worked as a team in cleaning motors, and in doing that work they used the spirits. No one told him not to use the spirits—he did not use Oakite (soap solution), because it was too strong. On the day of the accident when he and plaintiff went to the car he did not hear any buzzing. He stayed outside while plaintiff was in the car. He did not remember whether he got the spirits on that day but he might have done so. He had used the spirits during the week before the accident.

The machinist, called as a witness by plaintiff under section 2055 of the Code of Civil Procedure, testified that he heard the buzzing in the car; it was the duty of the electrician to check the buzzing; plaintiff and Miranda were men who cleaned motors; he (witness) did not authorize them to go into this car; the Oakite pipes were torn up about three times, but he did not remember "over what period of time" the work was done.

The electrician called as a witness by defendant testified that, on the day of the accident and prior to the time plaintiff entered the car, he heard a buzzing in the car; he (witness) and the machinist entered the car "to see what the buzzing was," and they found that it was coming from a small box which is known as the latch stop relay; the points open about a half or three-quarters of an inch when they are latched open, but they could not be latched open "because the latch bar was gone"; the relay was in bad order; he did not try to repair it, but only broke the circuit by inserting a paper (double thickness of note paper) in the interlock; the buzzing could have been caused by the making and breaking of the contact—by an electric spark jumping back and forth—a spark of a voltage between 24 and 64 volts; he reported to the shop foreman that the relay was "to be repaired," and he (witness) was instructed to wait until the next day "for repairs"; there were uninsulated places on the motor where a spark could be made if one of those places and another metal place on the motor were touched by an iron pipe or the spray gun; after the accident he saw the spray gun on the ground about 6 feet from the car, and he "heard that there was a burned place

on the nozzle''; he saw a burned spot on the end of the battery terminal connection on the starter solenoid ''corresponding to the one on the tip.''

Mr. Smith, the assistant roundhouse foreman, called as a witness by defendant, testified that he was foreman on the day shift in connection with the refrigerator cars; that shift for the laborers ended at 3 p. m. and his shift ended at 4 p. m.; plaintiff's shift commenced at 3 p. m., and he was under the shift of the witness one hour a day; during the remainder of plaintiff's shift no foreman was in the immediate vicinity; he (witness) instructed plaintiff to switch from the use of the spirits to the soap; there were pipes and a tank for the soap; after the change was made, from spirits to soap, there was no return to the use of spirits; after the switch to soap, it never came to his notice in any way that the cleaning workmen had gotten spirits for the purpose of cleaning the motors; spirits, used by the electricians for cleaning electrical equipment, were in a 55-gallon barrel between two shacks; when spirits were used for cleaning the cars, it required about 40 to 45 gallons a day for that work; after the soap pipe had been installed, it was moved to another location.

Mr. Lugenbill, general foreman of defendant's shops at Barstow, called as a witness by defendant, testified that until the fall of 1956, the motors of the refrigerator cars were cleaned with a solvent material referred to as spirits; at said time in the fall, the use of spirits was discontinued and was replaced with a soap material; facilities for use of the soap were installed—a 450-gallon tank was installed and underground pipes were connected with the tank and extended to places near the track where the cars were serviced; after the use of soap was commenced, it never came to his attention that the men had resumed the use of spirits; after the soap facilities were installed, the pipes were moved to the other side of the tracks—the work in making that change was commenced on June 12, 1957 (about a month before the accident), and it was completed within approximately five days.

Mr. Smart, general labor foreman, called as a witness by defendant, testified that after the change from spirits to soap, in the fall of 1956, a 55-gallon drum of spirits was kept about 60 to 70 feet from the place where the spirits had been kept previously; the spirits in the drum were for the electricians, who worked in that area, to use in cleaning tools and electrical parts; after the soap tank was installed there was a short period of time when the soap was taken directly out of the

tank into a bucket (as distinguished from taking it from outlets in a pipeline along the track) ; at a later date, before the accident, the pipelines were disconnected from the tank and moved to another location with ''slight changes made''; during the changing of the pipeline, the cleaning men used soap which they obtained from an outlet in the side of the tank and carried in a bucket or small tank; at the time of the accident the pipelines were still there but he did not remember whether ''they were entirely hooked up''; at one time ''a pipe had been broken in changing,'' but he could not state whether that was just before the accident, but it was around that time—it could have been a week before.

Section 51 of title 45, United States Code Annotated, provides in part: ''Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.''

Section 54 of title 45, United States Code Annotated, provides in part: ''In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier; and no employee shall be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.''

Appellant contends that there was no evidence that it was guilty of negligence proximately causing the accident. The argument on behalf of appellant is to the effect that plaintiff's testimony shows that the accident was caused only by reason of his violation of the instruction to use the soap, and that he introduced the agency (spirits) which caused his injury; the appellant could not reasonably have anticipated, or taken precautions against, the accident which was brought about by plaintiff's own act in violating the instruction to use the soap; even if it be assumed that a spark from the defective

motor was the source of ignition, there would have been no danger except from the flammable cleaner he took into the car; there was no hazard in his work or in the premises except as introduced by himself; there was no evidence that the instruction to use soap had been withdrawn or abrogated by practice; there was no evidence that any responsible agent of appellant was aware of a violation of the instruction; appellant was not required to make a violation of the instruction impossible.

Plaintiff's testimony was that the assistant roundhouse foreman told, instructed, or ordered them to use the soap or Oakite, and that the spirits would be taken away. It is to be noted that it was implied therein that the spirits should not be used, but there was no express direction that spirits should not be used; nor was there any statement as to the reason for discontinuing the spirits which had been used for a long period of time. The barrels of spirits were taken away, and plaintiff used the soap. Later a drum of spirits was installed at a place about 65 feet from the place where the barrels of spirits had been located. According to testimony on behalf of appellant, the spirits were returned because the electricians wanted the spirits for use in cleaning tools and electrical parts. There was no evidence that said reason for returning the spirits was known to plaintiff. After the soap had been installed (and before the accident), the pipeline which conveyed the soap solution was moved and during the time of such removal, approximately five days, the pipeline was not in use. On other occasions when the pipeline was broken or being moved it was not in use. The machinist testified that on one occasion when the pipeline was being moved the spirits were used by plaintiff and the other cleaning men. About a week before the accident, when plaintiff returned to work after having been away for two days, the other men were using the spirits. There was testimony (by the general labor foreman) that an occasion when there was a broken pipeline "could have been" a week before the accident (i.e., about the time when plaintiff returned to work). After plaintiff returned to work and during the week before the accident, the plaintiff and the other men used the spirits—which they obtained from the 55-gallon drum. There was evidence that, before the soap was installed, the cleaning men used approximately 45 gallons of spirits daily for cleaning the cars. The machinist and electrician, who were authorized to give orders to plaintiff and

Miranda and who were members of their crew, were present in the vicinity of the service track where plaintiff and Miranda were performing their work.

In *Rogers* v. *Missouri Pacific R. Co.*, 352 U. S. 500 [77 S.Ct. 443, 1 L.Ed.2d 493], it was said (p. 506) that under the Federal Employers' Liability Act "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." It was said further therein (p. 508) that "The burden of the employee is met, and the obligation of the employer to pay damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference."

Upon the question of liability herein the issue is whether there was any negligence on the part of defendant proximately causing the accident.

Where there is some employer negligence proximately causing the accident, a violation of a rule or instruction by an employee constitutes only contributory negligence, to be evaluated on a comparative negligence basis under the Federal Employers' Liability Act. (See *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U.S. 54, 67 [63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967].) Under said act the principle of contributory negligence may not be asserted as a defense on the issue of liability (*Smith* v. *Southern Pac. Co.*, 138 Cal.App.2d 459, 464 [292 P.2d 66]), but may be evaluated on the issue as to amount of damages on a comparative negligence basis in mitigation of damages. (See *Perrett* v. *Southern Pac. Co.*, 73 Cal.App.2d 30, 33 [165 P.2d 751].)

Under said act "the duty which rests upon defendant is the same as at common law, namely, to use reasonable care in furnishing its employees with a safe place to work and safe tools and appliances. Negligence as used in the act is the violation of that duty." (*Thompson* v. *Atchison, T. & S. F. Ry. Co.*, 96 Cal.App.2d 974, 977 [217 P.2d 45].)

In the present case it was established that the motor in the car was in bad order or defective, when the plaintiff and the machinist arrived at the car, in that there was a buzzing in the motor which was caused by an electric spark jumping back and forth. It was also established that the defective relay was not repaired at that time, but the electrician only broke the circuit by inserting a paper in the interlock. The

jury could reasonably infer from the evidence that the cleaning fluid was ignited by a spark from the defective motor.

The jury could infer that, after the soap solution had been installed, spirits were used by plaintiff and other cleaning men with the knowledge of appellant, in view of the evidence that spirits were available, that spirits were used with the knowledge of the machinist when the pipeline was out of commission, that the spirits were used during the week preceding the accident when the machinist and electrician were in the area where the spirits were used, that the machinist, electrician, plaintiff and Miranda worked as a team, that such a large quantity of spirits was taken from the 55-gallon drum daily that it was necessary to replenish the drum daily.

Under the evidence the jury could find there was negligence on the part of appellant proximately causing the accident.

Appellant contends further that since any recovery must be reduced in proportion to respondent's (plaintiff's) own negligent contribution, the judgment is excessive as a matter of law. The argument on behalf of appellant is that even if it be assumed that evidence of some negligence on appellant's part may be deemed to be found, ''it is evident that respondent's damages must have been enormous, and must have warranted an award of many hundreds of thousands of dollars, if his share of the blame may be deducted and still leave him with an award of $60,000.'' It is argued further that since it was respondent who used the spirits, no blame rests on the employer. It is conceded that respondent was burned severely on large areas (approximately 50 per cent) of his body and limbs. He was in a hospital nine months. He had a life expectancy of 18 years. He earned $281 a month. He is not able to work. The matter of damages was a question of fact for the jury. It does not appear that the award was the result of passion or prejudice. The trial judge denied appellant's motion for a new trial.

The judgment and the order denying the motion for judgment notwithstanding the verdict are affirmed.

Fourt, J., and Lillie, J., concurred.