Joe F. SOTO, Plaintiff,

v.

SOUTHERN PACIFIC TRANSPORTA-
TION COMPANY, Defendant.

Civ. A. No. SA–77–CA–171.

United States District Court,
W. D. Texas,
San Antonio Division.

Nov. 5, 1979.

Norman R. Jones, Downman, Jones &
Granger, Bellaire, Tex., for plaintiff.

Ferd. C. Meyer, Jr., Matthews, Nowlin,
Macfarland & Barrett, San Antonio, Tex.,
for defendant.

BOOTLE,* Senior District Judge:

Ready for decision now is the defendant's
motion for judgment in its favor notwith-
standing the jury verdict for plaintiff. At
trial the court overruled the defendant's
timely motions for directed verdict though
then entertaining serious doubts as to
whether the evidence warranted jury sub-
mission. That conservative course was
adopted so that the jury could pass upon
the case in the first instance thereby avoid-
ing the necessity, come what may, of rein-
stating the case upon an overcrowded trial
docket.

When the instant motion came in, the
court, though still recalling the evidence
right vividly, out of an abundance of cau-
tion, and so that the motion could receive

* Sitting by designation.

the careful consideration to which it is clearly entitled, ordered a transcript of the record as it relates to negligence and causation. A study of that transcript confirms the doubts which the court entertained at trial. A brief summarization of the facts will disclose the necessity for granting the instant motion.

In 1974, plaintiff, then 35 years of age, went to work for defendant as a laborer. Then for a short while he became a machinist apprentice, was relieved of employment through a reduction-in-force layoff, and then rehired as a laborer.

On April 29, 1976 he reported for work on the 11:00 P.M. to 7:00 A.M. shift. He began work cleaning out the number 6 diesel pit. He says his gang leader said, "Well, let's start cleaning those pits." The gang leader says he did not tell him to clean the pit but that the plaintiff started to clean the pit because "we been told by the foreman to clean up around there."

There are two diesel pits, number 6 and number 7. They are cement-lined excavations underneath the railroad tracks, as wide as the tracks, five or five and one half feet deep, and as long as two diesel engines. The purpose of the pits is to permit workmen to stand upright and perform maintenance work on the lower parts of the diesel engines. The pits become cluttered with sand dropping from the engines and tracks, with oil dropping from the engines, with rain water until it runs out through a drain at the bottom of the pit and with other debris including cans and trash that sometimes finds its settling place there. There are three methods for removing all this matter from the pits. The area adjacent to these pits on all sides is paved. In all three methods the workman descends into the pit by a ladder at one end and with a shovel throws the debris up and out to the paved area adjacent to the pit. In one method he throws it directly into a wheelbarrow situate adjacent to the side of the pit. When the wheelbarrow is loaded to a proper extent and amount (determined by the workman) he ascends the ladder, rolls the wheelbarrow and content a distance of approximately fifty to seventy-five feet, dumps it into a pile, then returns and repeats the process. Another method is to shovel the debris into a container constituting a part of a front-end loader commonly called a "bobcat." The third method is to shovel the debris directly into a metal box attached to a forklift.

The evidence is vague and uncertain as to what, if any, considerations determine which of the three methods is used.

Charles L. Casey, a mechanical foreman with the defendant, with six years experience, testified that there was no reason why he would use a wheelbarrow on one occasion and a forklift or a bobcat on another. (Transcript p. 205)

Benjamin Franklin Phrampus, a diesel mechanical foreman, when asked, "What about using the bobcat or forklift at night," testified that on the 3:00 to 11:00 shift he seldom used the bobcat or forklift; that one reason was that there wasn't a key available and most of the time the bobcat and the forklift were broken down; "only use it when I needed to use—move heavy materials, tractor's motors and wheels," and that on his shift if the bobcat or forklift had been available to him he would have used them if he needed them but "I can't elaborate any why I would use it or what would make me need it." (p. 259)

James Earl Hill, a gang leader, testified, "there is really no set way to do it." (p. 267)

Whereas, Mr. Casey, the mechanical foreman, said "the most common used method is a forklift" (p. 213), Mr. Raymond Valenzuela, Jr., an apprentice machinist, formerly a laborer, testified that he had used a forklift "one or two times . . . when the bobcat was broke[n] down." (p. 219)

Apparently, only the wheelbarrow was used on the night shift. Plaintiff's gang leader, Mr. Jasso, did not know how to operate the bobcat. (p. 284) Plaintiff had never operated either piece of equipment and had never been trained to do so. (pp. 118, 165) Mr. Casey, the mechanical foreman, testified that a man would have to

receive some instructions before operating the bobcat—about a half hour—and "a few minutes" instruction before using the fork-lift. (p. 208)

James Earl Hill, the gang leader, says he never really makes the decision based upon how much sand is in there, "but you could. If you got a lot of sand . . . you are going to need a forklift and sand box . . . If you got a little bit of sand, you use the front end loader . . . . When it's practically nothing in there [two or three wheelbar-rows full] you would use the wheelbarrow." (p. 267) Similarly, Mr. Jasso, plaintiff's gang leader, testified, "Well, we got a little bit of sand or whatever gets in the pits, we use a wheelbarrow all the time . . . . When we get . . . a whole lot of sand, we get a forklift and a hopper or that bobcat." (p. 282)

On the night in question the plaintiff loaded the wheelbarrow once and rolled it away some fifty or seventy-five feet, emp-tied it and rolled the empty wheelbarrow back to the pit. There was no mishap on that first trip. Plaintiff estimates that the first load weighed 200 to 300 pounds. Then he reloaded the wheelbarrow, pushed it the same distance and when he was unloading or "dumping" the wheelbarrow he heard something "pop" and felt something in his back. He felt no pain then because his "body was still hot." (p. 112) The pain came later. He was "going to go back in the hole" but was called away to another assignment. (p. 113) Apparently there was not much debris in the pit that night. When asked about that, the plaintiff said, "plenty to fill up two of those [wheelbarrow loads]." (p. 151) We have plaintiff's testi-mony that he was "about to go back in the hole," but was sent to another job and the gang leader's testimony that he "guesses" the plaintiff got the pit pretty well cleaned out, though he did not check it.

Of controlling significance are the follow-ing facts:

There was nothing wrong with the wheel-barrow that night. The plaintiff so testi-fied. (p. 148) In fact, it had a rubber tire and the defendant had been using rubber-tired wheelbarrows for ten years; (p. 270)

There was nothing wrong with the shovel that night. The plaintiff so testified; (p. 148)

Moreover, there was nothing wrong "with the area there where [plaintiff] was working along within the pit or on the walkway." The plaintiff so testified. (p. 148) This means that there was no obstruc-tion or impediment to the free rolling of the rubber-tired wheelbarrow; and

There was no one rushing the plaintiff to do the job in a hurry (p. 150) and there was no reason why the plaintiff could not have put less sand in the second load. (p. 151) The plaintiff so testified.

■ This court is not at all unmindful of the great reluctance courts entertain with respect to limiting jury resolutions in FELA cases. Even minimal negligence on the part of the railroad employer will support a verdict in favor of the employee. Certainly if even minimal evidence supports a jury finding against the employer such a finding is invulnerable. But just as certainly, if a verdict finds no support in the evidence, it should be set aside. This rule was succinct-ly stated in *Rodriguez v. Delray Connecting R. R.*, 473 F.2d 819 (6th Cir. 1973) as fol-lows:

The Federal Employer's Liability Act consistently has been construed liberally by the courts to allow employees, injured in the course of their employment, to recover even where the negligence of the employer has been minimal.[2] However, the employee must still demonstrate some negligence and proximate cause. *Herd-man v. Pennsylvania RR Co.*, 352 U.S. 518, 520, 77 S.Ct. 455, 1 L.Ed.2d 508 (1957); *Tiller v. Atlantic Coast Line RR Co.*, 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610 (1943).

2 See for example, Gallick v. Baltimore & Ohio RR Co., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) (Railroad held liable where an employee was bitten by an insect. Negli-gence was found in permitting a stagnant pool of water to exist that attracted vermin and insects.); Webb v. Illinois Central RR Co., 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503, rehearing denied, 353 U.S. 943, 77 S.Ct. 809, 1 L.Ed.2d 764 (1957) (Railroad found liable where an employee slipped on a cinder embedded in a roadbed.); Tennant v. Peoria & Pekin Union RR Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520,

rehearing denied, 321 U.S. 802, 64 S.Ct. 610, 88 L.Ed. 1089 (1944) (Railroad found liable where one of its engineers failed to ring a bell before starting the locomotive.)

The rule must still be that in order to recover the plaintiff must "demonstrate some negligence and proximate cause."

The plaintiff alleged negligence on four grounds, which are:

(a) Defendant failed to furnish the plaintiff with a reasonably safe place to work;

(b) Defendant failed to furnish the plaintiff with reasonably safe equipment with which to perform his work;

(c) Defendant failed to warn the plaintiff of the hazardous method by which he was being required to accomplish his assigned task; and

(d) Defendant required the plaintiff to perform tasks of heavy manual labor for which he was physically unfit and which the defendant knew or should have known would be injurious to the plaintiff's physical condition.

With respect to ground (a), there could hardly be a safer place to work than the paved area over which plaintiff was rolling the wheelbarrow.

With respect to ground (b), the plaintiff's own testimony, not contradicted by any other evidence in the case, demonstrates that both the wheelbarrow and the shovel, as well as the area where plaintiff was working, along with the pit and the walkway, were safe. If this verdict stands its purported message to railroads would be that they can no longer use wheelbarrows, even when equipped with rubber tires, and that the use of such wheelbarrows is "unreasonable." That message would be much more startling and more drastic than the message sent by *Rodriguez, supra,* to the effect that the appearance on the modern scene of the hydraulic spike remover rendered "unreasonable" the old maul and crowbar method of removing spikes. There is much difference between a rubber-tired wheelbarrow moderately loaded and being pushed over a smooth level surface and swinging a maul striking steel against steel.

We perceive the law still to be that even in FELA cases an employer is neither required to furnish the employee with the latest, best or most perfect appliance with which to work, nor to discard standard appliances already in use that are reasonably safe and suitable, even though later improvements have been discovered. *Chicago & Northwestern Rwy. Co. v. Bower,* 241 U.S. 470, 36 S.Ct. 624, 60 L.Ed. 1107 (1916); *Baltimore & Ohio Rwy. Co. v. Groeger,* 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419 (1925); *Atlantic Coastline v. Dixon,* 189 F.2d 525 (5th Cir. 1951). *See also Palmer v. Wichita Falls Northwestern Rwy. Co.,* 159 P. 1115 (Okl., 1919) and *Lowden v. Bowen,* 183 P.2d 980 (1947).

Since the railroad employer is charged with the duty of providing the employee with reasonably safe equipment in order to meet that responsibility, the employer must be accorded the privilege of selecting the equipment. It is not difficult to imagine what could have happened if defendant had ordered the plaintiff to use this mechanical equipment with which he was not familiar and as to which he had received no training. If he had used such equipment and if it caused him injury, the plaintiff, with some logic, could have urged that the defendant was negligent in not providing him with the more easily operated and much safer wheelbarrow.

As to ground (c), we fail to see that under the evidence in this case plaintiff was being required to accomplish his task in any hazardous manner or that any warning was required or appropriate.

As to ground (d), the evidence contains no suggestion that defendant had any knowledge that plaintiff was physically unfit to do the work ordinarily required of a laborer at a railroad, for which work plaintiff applied and was accepted. On the contrary, the record shows that plaintiff had had no physical problems when he was employed by defendant (p. 100), that he was employed as a laborer (p. 100), and that "before he went to work for the railroad company he [had] always engaged in jobs that required heavy lifting, manual labor." Plaintiff's counsel, in his opening statement to the jury, stated that plaintiff had previously served as a truck driver "which involved

delivering beverages where they would lift kegs of beer and cases of beer and soda pop and deliver them ...." (p. 76)

Notwithstanding the great latitude which the law allows to juries in finding "minimal" neglect against a railroad employer under the Federal Employers Liability Act and with no criticism of that latitude, this court is impelled to the conclusion that, under the facts of this case, not even minimal negligence has been established.

Counsel for the defendant may prepare and submit an appropriate order granting the pending motion, after affording counsel for plaintiff an opportunity for suggestions as to form.