BENSON v. MISSOURI, K. & T. R. CO.

No. 13743.

Court of Civil Appeals of Texas. Dallas.

Nov. 22, 1946.

Rehearing Denied Jan. 24, 1947.

Hassell & Hassell, of Dallas, for appellant.

G. H. Penland, M. E. Clinton and Touchstone, Wight, Gormley & Touchstone, all of Dallas, for appellee.

YOUNG, Justice.

This suit for damages under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., was by appellant administratrix for benefit of herself and two minor children, arising out of the death of her husband Alfred G. Benson while employed as brakeman on a freight train of defendant engaged in interstate commerce; the fatality occurring at Lindsay Flag Station about six miles west of Gainesville, Cooke County, on the Wichita Falls-Denison line of said railway. Following a jury trial, the court rendered judgment in accordance with motion of defendant; it having alternatively moved for judgment non obstante veredicto on ground of no evidence upon which the court was authorized to submit the cause to a jury; at the same time overruling plaintiff's motion for judgment notwithstanding the jury answers to certain questions.

Omitting definitions and instructions not material to propositions hereinafter presented, the jury questions and answers are given in substance, numbered as in the court's charge: (1) At the time of his death in the early morning of August 2, 1945, Alfred G. Benson was in performance of duty in connection with the operation and movement of a westbound train upon which he was brakeman. (2) Defendant, its agents and servants, were negligent in the manner of laying and maintaining its main line and passing track and area between same where deceased Benson was performing his said duties. (3, quoted in full) "Do you find from a preponderance of the evidence that such negligence of the defendant, if any, was the direct and proximate cause of the death of Alfred G. Benson? * * * Answer: No." (4, quoted) "What sum of money, if any, if paid now will reasonably and fairly compensate plaintiff and her two children for the damages, if any, sustained by reason of the death of Alfred G. Benson? * * * Answer: $37,030.00." (4-A) Above amount was apportioned, viz.: Lela Mae Benson $22,030, Geo. Grady Benson $7,500, John Anthony Benson $7,500. (5) Deceased

Alfred G. Benson failed to place himself .in a position of safety at the time he met his death; (6) which was negligence, and (7) a proximate cause of death. (8) The action of deceased Benson in being between the main track and the passing track at time of death was not negligence. (9, on sole proximate cause, conditioned on affirmative answer to issue 8, not answered.) (10) Death of Alfred G. Benson was not due to a new and independent cause; and (11) was not the result of an unavoidable accident. (12, fully quoted) "What percentage of negligence, if you have found such negligence on the part of the defendant, proximately contributed to cause the death of the deceased? Answer from a preponderance of the evidence as you find the facts to be in percentage. 60%. In connection with the above issue you are instructed that the term proximately contributed to cause means a concurrent act or acts of negligence on the part of both the deceased and the defendant which proximately caused his death, if you so find that both parties were negligently responsible." (13) On the occasion in question, Engineer Stitzel did not start his train from its position on the passing track without giving signal or notice of his intention so to do. (14 and 15, on negligence and proximate case, conditioned on affirmative answer to issue 13, not answered.) (16) The signal given by Engineer Stitzel was in sufficient time to give notice to .Alfred G. Benson of the intention to move said train. (Issues 17 and 18, on negligence and proximate cause, conditionally submitted, not answered.) (19) At the time Alfred G. Benson met his death he had completed his duties with respect to inspection of train and was not then engaged in performance of any specific duty pertaining to his employment; but that (issue 20) such failure was not negligence. (21, on proximate cause, not answered.) (22, on sole proximate cause, conditioned upon issue 19, not answered.)

Fairly summarized, appellant's points of appeal are (1) The court's error in not sustaining her motion for judgment for 60 percent of the total damages found, being the proportion of negligence chargeable to defendant (issue 2), and a con-

curring proximate cause of deceased's death (issue 12), notwithstanding jury answers to issues 5, 6, 7, 13, 16 and 19, said latter answers being upon evidentiary and immaterial issues; the material findings of the jury (issues 2 and 12) requiring a verdict in plaintiff's favor in the amount of at least $22,218; (2) plaintiff was entitled to judgment for $22,218 (60% of $37,030) on the foregoing verdict, since the jury found, in response to issue 1, that Benson at time of death was in performance of his duty as brakeman in connection with the operation and movement of said westbound train; and, in response to issue 2, that defendant was negligent in the respects complained of; answering issue 12 that such negligence of defendant concurring with negligence of deceased, proximately caused his death, defendant's liability being 60% of the total damages found; and this, regardless of the jury finding under issue 3 that defendant's negligence was not the sole cause of Benson's death; (3) in the alternative, if said jury finding be not harmonious, then the court erred in refusing to set aside and disregard answers to issues 3 and 12 as being in irreconcilable conflict, entitling plaintiff to a new trial; (4) issues 5, 6 and 7 were evidentiary and not ultimate, at least having no evidence in support; and, further, were upon the weight of the evidence, assuming that there was some duty resting on deceased to find a place of safety, whereas such nondelegable duty rested at all times on the defendant, he having a right to assume that any part of the premises furnished for such purpose in performance of his duty was a place of safety; such issues disregarded the Employers' Liability Act under which suit was brought, in that deceased was thereby charged with assumption of risk in failing to find a place of safety, the Act having abolished assumption of risk; (4-a) issues 5, 6 and 7 placed upon deceased, in effect, a greater duty than imposed by law, suggesting to the jury that he was required to seek some place of safety in order to protect himself against defendant's negligence in furnishing him the place where he was and had a right to be; the submission inviting a finding that it was

this failure to secure a place of safety, and not defendant's negligence, that caused his death; (b) likewise, the submission of issues 5, 6 and 7 was error, being calculated to confuse the jury and distract their minds from the predominating issue of whether defendant's negligence, as found by them in answer to issue 2, was a cause or contributing cause of Benson's death; (5) complaining of further error of the trial court in the matter of sustaining defense objections to evidence offered by plaintiff and to remarks of her counsel in opening argument; also in overruling objections made to questions propounded by defendant to witness Winkle, in particulars as hereinafter shown.

Before discussing these points, the facts generally incident to this fatal occurrence should be briefly told. Westbound freight train No. 381 (31 cars), of which Benson was head brakeman, pulled into the passing track (south side main line) around 2:30 on the early morning of August 2, 1945, with orders to wait until 3:15 a. m. for eastbound freight No. 372; stopping about 300 to 325 feet east of the west switch stand, being some two or three car lengths from clearance point, which means where the passing track extending straight west begins its convergence onto the main line. Then Conductor Wagner and rear brakeman McNeil, as was their duty, started from the caboose inspecting the train, meeting Benson, seven or eight cars from the engine, on the same duty. The inspection completed, all three walked back to a point even with the engine gangway which Wagner climbed into; McNeil and Benson talking at the spot some seven or eight minutes, then walking over and sitting down on the south rail, main line, talking and smoking for a similar interval. The space between the north rail of passing track and south rail of main line was 9 feet and 6 inches. McNeil then rose from his seat beside Benson, going to the cabin or "doghouse" (a small enclosure atop the tender for use of trainmen), climbing up a ladder at rear end. The last time deceased was seen by McNeil or any one else, so far as disclosed by the record, he was sitting on this south rail of the main track opposite the engine gangway. After some 15 min-utes, eastbound train No. 372 approached, whistled, the two engineers exchanging precautionary signals (blinking of headlights), and passed without stopping; whereupon Engineer Stitzel moved his train up to the west clearance point, approximately two car lengths, speed three to four miles per hour, and halted because Benson was missing.

Upon going back to investigate, deceased was found, in a dying condition, between the two tracks in the neighborhood of where the engine of 381 had first stopped; as all witnesses testified, except Engineer Stitzel, whose testimony appears to place the body some two car lengths further east, at or near a cattle guard. This barrier against stock, 8 feet and 7 inches from east to west, extended across both tracks and the space between; located 153 feet east of above mentioned west clearance marker and some 366 feet from west switch stand or point. Across the passing track and intervening space, the structure consisted of narrow steel slabs attached to ties at both ends, with triangular blades or spines rising sharply to a point. From oral testimony and pictures in evidence, the presence of weeds, vines and Johnson grass, in August 1945, gave to the stock guard locality, adjacent to main line, at least the appearance of being fairly well obscured. Also in evidence was the left shoe of deceased, heel torn away from pegging. His left leg was broken between ankle and knee, skull fractured, neck broken third vertebra from shoulder, as well as practically all ribs on right side and shoulder bones. When found, the position of head was to the east, feet to west, body lying on back, a little to right side; certificate of death showing cause as a "penetrating and crushing injury in parietal (head) region."

It is appellant's theory that Benson, hearing the whistle of eastbound 372, started to rear of train 381 for purpose of giving some necessary signal after 372 had passed; that he stepped or stumbled into this stock guard and, falling upon the spines or spikes, sustained mortal injury; his body being then caught by the journal or brake beam of his own train and dragged to the point where found.

It will be observed from the court's charge that plaintiff's primary claims of negligence were embodied in issues 2 and 13; the jury disposing of the latter before reaching the question of negligence, and, as to the former, deciding that defendant's negligence in the maintenance of stock guard (relative to vines, weeds and tall grass) was not "the direct and proximate" cause of ·Benson's death; in which connection, proximate cause was defined as "that cause which, in its natural and continuous sequence, unbroken by any new independent cause, produces a result that would not have occurred but for such cause, and which result, or some like result ought, reasonably, to have been anticipated or foreseen in the light of the attending circumstances. There may be more than one proximate cause of an event." In view of this definition, the jury simply concluded, by their answers to issues 2 and 3, that either (1) defendant's manner of laying and maintaining its main and passing track in the area where deceased sustained a fatal injury had no connection with his death, or (2) if the casualty be attributable thereto, that such result could not reasonably have been foreseen or anticipated by a person of ordinary prudence.

 Attention is here directed to the language of issue 3, inquiring if the negligence charged in issue 2 was "the direct and proximate cause" of death. Citing El Paso Electric Co. v. Sawyer, Tex.Civ.App., 291 S.W. 667; Id., Tex.Com.App., 298 S. W. 267, appellant argues that "the direct and proximate cause" is identical in law with "sole proximate cause"; and that the jury's response to issue 3 was merely equivalent to a finding of sole proximate cause, not precluding them from establishing defendant's negligence, already found, as a concurring or contributing cause of death, which.they did under issue 12. Plaintiff did not object to "the direct and proximate" wording of issue 3, and a consideration of the entire charge convinces us that the issue of sole proximate cause was not raised or intended under said issue. Other issues in the charge dealt directly with sole proximate cause, unanswered because of a conditional submission. The instant facts are quite dissimilar to those present in El Paso

Electric Co. v. Sawyer, supra; for to say that the jury has answered issue 3 as involving a question of sole proximate cause, when the term was not there used, but was used elsewhere throughout the charge, would be to conclude that the charge was not considered by the jury in its entirety. In the situation here presented we must presume that the jury considered the charge as a whole and observed the difference between the particular use of sole proximate cause in issues 9 and 22 and "direct and proximate cause" as used in issue 3. Likewise, we must presume that, in their negative answer to the issue, the jury considered and followed the court's definition of proximate cause as already quoted and discussed.

 Furthermore, issue 12 is plainly conditioned upon other sets of issues and answers, wherein both parties have been found "negligently responsible." Standing alone, the jury answer to issue 12 is a general finding, not based on any specific act or omission on part of defendant having a causal connection with deceased's death. Where special issues on negligence are answered against plaintiff, the general issue and answer on damages and related matters become immaterial. Garza v. San Antonio Transit Co., Tex.Civ.App., 180 S.W.2d 1006; for a general finding at variance with specific findings of the jury must be disregarded. Bragg v. Hughes, Tex.Civ.App., 53 S.W.2d 151; Howard v. Howard, Tex.Civ.App., 102 S.W.2d 473 (writ ref.); Sproles v. Rosen, 126 Tex. 51, 84 S.W.2d 1001. And these authorities, among others cited in 41 T.J., sec. 360, sufficiently answer the claim of irreconcilable conflict. Findings 3 and 12 are thus seen as entirely consistent and harmonious.

 Negligence of the employe is an issuable fact, under the Employers' Liability Act, 45 U.S.C.A. § 53, serving merely to diminish the recovery; and, contrary to appellant's contention, issues 5, 6 and 7, involving negligence of deceased as a proximate cause of death, were in all respects proper. Defendant had pled that Benson was at fault on the occasion in question, in failing to keep himself in the clear and in a place of safety until after train 372 had

passed; a defense witness testifying that after completing inspection of train 381, its employes (conductor and brakemen) had no intervening duty under the rules except to "stay in the clear"; and that the tender cab or "doghouse" was available as a safe place for trainmen during waiting periods. It is further argued that deceased was entitled to protection against the very hazard that overtook him while on defendant's premises, thereby raising the question of assumption of risk, abolished by the 1939 Federal Amendment. The objection is untenable, because in the particular issue (No. 5) there was no element of assumed risk; on other hand, presenting the specific fact question of deceased's own failure to observe the foregoing rule of safety. Louisville & N. R. Co. v. Parker, 223 Ala. 626, 138 So. 231, certiorari dismissed, 1932, 287 U.S. 569, 53 S.Ct. 94, 77 L.Ed. 501.

■ Objection was sustained to plaintiff's inquiry of defendant's employe Cornell, a civil engineer, as to whether the particular stock guard was calculated to pull the heel from the shoe of a man stepping upon it; the ground of objection being that the query invaded the jury's province, involving speculation and guesswork from an unqualified witness. The court's reason for so ruling is reflected in the following colloquy:

"The Court: If it is a matter that any ordinary man would know as much about as an expert, why then, an expert is not permitted to testify. I don't know whether he is qualified on this particular thing or not.

"Mr. Hassell: He says he knows about strength of steel and stuff of that sort; he is a graduate engineer.

"The Court: We have the shoe and we have the piece of steel and if the ordinary man would know as much about it as he does then it would invade the province of the jury. I believe I will sustain it." Judge Rawlins could well have considered the question as outside the field of expert testimony. "There can be no hard and fast rule laid down as to how far the court in its discretion can go in permitting an expert witness to express his opinion as such, in a given state of facts." McCrory's Stores Corporation v. Murphy, Tex.Civ. App., 164 S.W.2d 735, 742.

■ A train rule, introduced by plaintiff, stated that "Enginemen of freight trains must, when practicable, get a proceed signal from rear end of train before passing any station or side track that is designated on the timetable"; and plaintiff's objection to testimony of Winkle, defendant's superintendent of safety, interpreting the word "practicable", was overruled. The witness, from 30 years' service, was undoubtedly competent to apply this rule to actual train operations; the answer objected to having no unfavorable bearing on plaintiff's theory of the case, or particular materiality to any given issue or ultimate fact. The point is overruled.

■ Plaintiff's Exhibit 9, a picture of the cattle guard taken March 9, 1946, depicting the structure entirely free of vines, grass and weeds, was rejected as evidence, defendant's grounds of objection being changes in appearance of right-of-way since date of accident (August 2, 1945), in point of vegetation, ground level and road ballast. Appellant insists that the rule of inadmissibility because of lapse of time, surface variations, etc., would not apply to the exhibit which truly represented this stock gap at time of accident without the earlier obscuration. For such purpose the picture might well have been admitted. However, the structure, in make-up, layout and appearance, was testified to in great detail by various witnesses; portions thereof of varying size being in evidence. Also, Exhibit 15, in evidence is a substantial replica of the refused exhibit, for which reason the court's ruling involved no more than a rejection of evidence cumulative in effect, and, if error, was harmless.

■ Under points 13 and 14, appellant complains of objections made and sustained to the opening argument of her counsel, viz.: There was testimony that, later in the morning of August 2, some of defendant's employes took pictures of the scene of accident, which pictures were not offered in evidence. In commenting on their absence, counsel remarked upon what the pictures would have disclosed if introduced. In course of defense objection that the

statement was outside the record and highly prejudicial, Mr. Hassell, Jr., stated that he was merely undertaking to tell the jury what "he thought" the pictures would have shown. On inspection of the full bill, the court's ruling was, nevertheless, correct. Counsel was thereby permitted to comment on the absence of the particular testimony, the instruction going only to "what the pictures would have shown"; Robbins v. Wynne, Tex.Com.App., 44 S.W.2d 946; Smerke v. Office Equipment Co., 138 Tex. 236, 158 S.W.2d 302; Traders & General Ins. Co. v. Ross, 131 Tex. 562, 117 S.W.2d 423; and, viewing the record as a whole, was more favorable to appellant than otherwise.

Similarly, no error is shown in the court's jury instruction to disregard the reference by plaintiff's counsel to the cattle guard as a "death trap" under "the uncontradicted testimony," the ground of objection being that the quoted term was highly prejudicial, inflammatory and beside the record. Appellant insists that the stock guard, covered and concealed as it was on defendant's right-of-way, could properly be so characterized; New Century Dictionary defining the word as "A structure or situation involving imminent risk of death"; and (Webster's International) as "A place apparently safe but actually very dangerous to life." What constitutes inflammatory argument is dependent entirely upon the facts of the immediate case, and is determined by the trial court in the exercise of a rather fine discretion. This stock guard, an installation that appellee was required by law to maintain, was described as of standard construction; and, under the circumstances here presented, we are not prepared to say that a reference to it as a deathtrap was not objectionable. "The test", says Judge Speer, eminent jurist and author (Special Issues in Texas, 1932, Section 331), "is not literally whether the argument excites animosity, hatred or the like, strong emotions, but rather it is whether there is in the facts of the case justification, under rules of fairness, for the statements when their evident effect is thus violent." Moreover, use of the term "death trap" could have been only with reference to issue 2, answered in appellant's favor, for which reason counsel is in no position to complain.

This brings us to a consideration of appellee's cross assignment complaining of the trial court's failure to direct a defendant's verdict at close of all testimony, which assignment, if necessary to a disposition of appeal, should be sustained. In short, we find no record testimony of probative force in support of appellant's contention that deceased's fatal injuries were attributable in any wise to defendant's stock guard, whether negligently maintained or not. The scene of tragedy may be reconstructed only by circumstances and inferences legitimately to be drawn therefrom. Benson was last seen alive by McNeil, rear brakeman, sitting on the south rail, main track, some 15 minutes before eastbound 372 came through, travelling 30 to 35 miles per hour. Sullivan, defendant's claim agent, Lydle, district engineer, and Morrison, employe, examined the premises where such death occurred several hours later, the latter two testifying to a disturbance of the grass or weeds between main line and passing track, running eastwardly and diagonally; commencing south end of ties, main track, and extending to a point near end of ties on passing track, over a distance of 24 feet; that the beginning of said disturbed space was 330 feet east of west switch stand; distance from west switch point to west edge of cattle guard 418 feet; that over the disturbed area, grass was scuffed and leaning to the east, ballast slightly disturbed as if something had been dragged through it; the last five or six feet more disturbed, as though some object had been on it for some time; that the west edge of cattle guard was 64½ feet east of where such disturbance ceased, and that there were no other such marks in the vicinity or from direction of the cattle guard. Further testimony of the couple was that some three feet west of where aforesaid disturbed space began, a pair of work gloves, apparently placed across the south rail, main track, had been cut in two, the ends lying on both sides of rail; that in the same area was a match box, with matches scattered over the whole distance; a comb and pencil lying within the last five or six feet.

No definite measurement placed the body of deceased, when found, closer than 65 to 75 feet west of the stock guard; Keel, the Gainesville undertaker, stating that he walked that distance and direction to reach it. Keel also described the head injury, right side, as a three-cornered wound; a crushed appearance, with two-by-three-inch fracture—not a stab wound, but seemingly the result of a blow. Notwithstanding the testimony of Engineer Glover that some time later at Whitesboro his inspection revealed no marks on engine pilot or side indicating contact with any object, all proven facts and circumstances compel the inference that deceased was struck by some portion of the passing train. On the other hand, no inference legitimately deductible from any narrated testimony or physical facts, supports plaintiff's theory of the accident; and of course jury findings cannot rest upon speculation and conjecture. "Where the ultimate fact is not susceptible of direct proof, its existence must directly follow as a reasonable conclusion from its basic facts and circumstances and it may be stated as an axiomatic rule that whenever court or jury are left by the evidence in a situation where, in order to find the ultimate fact alleged, they must piece out the facts adduced with conjecture or supposition, the plaintiff must be held to have failed in his proof"; Byerly v. Consolidated Light, Power & Ice Co., 130 Mo.App. 593, 109 S.W. 1065, 1067. Texas Pac. Fidelity & Surety Co. v. Hall, Tex.Civ.App., 101 S.W.2d 1050; Cole v. Missouri-Kansas-Texas Railroad Co. of Texas, Tex.Civ.App., 179 S.W.2d 343 (Writ ref.)

All points urged for reversal of this cause are accordingly overruled and judgment of the trial court is affirmed.

## On Rehearing.

In motion for rehearing appellant moves for additional findings on suggested facts, in paragraphs numbered 1 to 16, the latter embracing five subdivisions. Aside from procedural points of error, which we believe have been adequately discussed, appellant's main argument centers around a proper construction of jury issues and answers 2, 3 and 12 taken together—obviously a matter of law; in which connection the further facts sought to be elicited are seen to be evidentiary in character and immaterial. This is illustrated by the first five paragraphs thereof requesting findings, viz: That Benson was an experienced railroad brakeman and cognizant of the duties of his position, etc.; that at and before the time of fatal injury he was sober and in full possession of normal facilities; that his hearing and sight were good, that he was alert and understood his duties with respect to the meeting and passing of opposite trains; that the approaching train had a strong headlight and a whistle that could be heard from the whistling post a mile away; that the passing track upon which Benson's train was standing was straight, etc. In short, all additional facts so sought and suggested "in so far as material, are either undisputed or mere recitations of evidence which support inferences in conflict with conclusions fairly inferable from other evidence upon which our original findings rest. It is our province to determine whether evidence exists sufficient to support the verdict and judgment, and not to pass upon the weight of conflicting testimony. In other words, it is never necessary, under our rules of practice, to find facts that are undisputed in the record, or recite evidence which may tend to conflict with findings made." Order of United Commercial Travelers of America v. Roth, Tex.Civ.App. 1913, 159 S.W. 176. 179, writ ref.

The request must be overruled, and, likewise, appellant's motion to the merits. As we understand paragraphs 7, 10 and 13 of the latter motion, it is charged that we have applied the common law rule to the instant finding of negligence (issue 2) in the matter of causation, whereas, the doctrine of comparative negligence (Federal Employers' Liability Act) requires a mere finding of defendant's negligence in connection with injury. In actions under this Federal statute, 45 U.S.C.A. § 51 et seq., there always remains for judicial determination the question of negligence on part of the employer and its causal relation to the injury; i.e., proximate cause; Tiller v. Atlantic Coast Line Railway Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A. L.R. 967.