33484. HOWARD *v.* ATLANTIC COAST LINE R. CO.

DECIDED JUNE 22, 1951. REHEARING DENIED JULY 12, 1951.

*Zeesman & Ruffin,* for plaintiff.

*E. F. Strozier, Jay, Garden & Jay, Matthews, Long & Moore,* for defendant.

SUTTON, C. J. George W. Howard sued the Atlantic Coast Line Railroad Company for damages for personal injuries under the Federal Employers' Liability Act (45 U. S. C. A., § 51), in the Superior Court of Crisp County. His petition alleged substantially that he was employed in interstate commerce as a yard foreman in charge of switching for the defendant railroad in Cordele; that he was in charge of a switch engine and its engineer and fireman, when he was injured at the crossing of the

defendant's tracks with Second Street in Cordele, at about noon on January 2, 1947; that Second Street runs north and south, and the railroad crosses it in an east and west direction; that the switch engine was approaching the Second Street crossing from the east and was backing up with the plaintiff riding on the footboard of the tender, that is, facing in the direction in which the engine was moving; and that the engine was proceeding at a speed of four miles per hour, when a taxicab belonging to P. H. Pate and operated by one Allison approached the crossing from the north without slowing down or stopping and drove onto the crossing in front of the locomotive, where the locomotive collided with it, crushing the plaintiff's foot.

The plaintiff's injuries and damages were set out, and it was alleged that the defendant was negligent (a) in the failure of its employees to keep a vigilant lookout as required by law; (b) in the failure of its engineer to apply the brakes on impact with the taxicab; (c) in failing to maintain in good repair and workable condition a device known as an angle cock, by which the air brakes may be applied from the rear of the tender; (d) in failing to maintain traffic bars, or a watchman in lieu thereof, at the crossing; and (e) in allowing the plaintiff only a skeleton crew, short two switchmen, and it was alleged that the defendant's negligence was the proximate cause of the plaintiff's injuries.

The defendant railroad company answered, denying responsibility for Howard's injuries, or that his injuries resulted from any negligence on the part of the employees of the railroad other than the plaintiff. The railroad company further set up in its answer that the injuries sustained by Howard were caused solely by the negligence of Howard himself and Allison, the driver of the taxicab. It was alleged that Howard was negligent (a) in that at the time of the collision, Howard was riding the footboard on the rear of the switch engine while it was proceeding backward, and that this act on his part was in violation of orders given by the defendant's general superintendent on June 20, 1946, which had been directly communicated to Howard and were known to him; (b) in failing to step off the footboard of the moving locomotive before the taxicab was driven into it; (c) in failing to warn the engineer and to order

him to stop the engine when it became apparent that the taxi-cab would collide with the locomotive; and (d) in failing to ride on some other portion of the locomotive while it was backing up.

By way of further plea, the defendant alleged that on May 29, 1947, Howard had filed suit against P. H. Pate, the owner of the taxicab, for the damages sustained as the result of the same injuries and based upon the same circumstances as the present action, and had recovered judgment therein, which had been partially satisfied through receivership proceedings against Pate's insurer. These facts were stipulated by the parties to the present action.

On the trial of the case, the plaintiff offered his own testimony and rested. The railroad company offered the testimony of its engineer and the fireman, who were on the engine involved in the collison, of a civil engineer, of its trainmaster, and of other employees who had inspected the engine before and after the collision. The evidence disclosed the following facts without dispute: The plaintiff had been employed for about twenty-six years as a switchman and yard foreman by the defendant railroad company, which was engaged in interstate commerce. He was in charge of an engineer and a fireman, directing their operation of a switch engine. It was also Howard's duty to do the work of a switchman on the ground, that is, coupling and uncoupling cars, throwing switches, and setting handbrakes. Second Street in Cordele runs in a north-south direction, and the defendant's main line crosses it at an angle from slightly south of east to north of west. To the east of the Second Street crossing, a passing track first switches off the main line, and then a scale track runs off the passing track and parallel to it. Shortly before noon on January 2, 1947, the plaintiff and the engineer and the fireman placed a cut of cars on the scale track, with the engine moving forward to the east, pulling the cars behind it. The cars were uncoupled by the plaintiff, and the engine again moved forward until it was switched back onto the passing or middle track. The engine was backed to the west until it came upon the main line track. It was stopped with its pilot or front end just west of the switch where the passing track joined the main line. The switch engine with its tender was about sixty feet long, and the rear of the tender was then

about 150 feet or two and a half lengths of the locomotive and tender from the center of the Second Street crossing. The rear of the tender was then visible for 210 feet north along Second Street, around a house on the east side of the street some 150 feet north of the main line tracks. This was the only obstruction to the view at the crossing.

Howard threw the main line switch, walked along the south side of the engine, and climbed onto the footboard at the rear of the tender. He signalled the engineer to back the engine toward the Second Street crossing. The engine, moving at four miles per hour, collided with the taxicab which was traveling from north to south on Second Street. The locomotive pushed the automobile for about thirty feet, or half the length of the locomotive and tender, before it stopped. The plaintiff's foot was caught between the back of the footboard and the taxicab.

The trial judge directed a verdict for the defendant at the close of the evidence. The plaintiff made a motion for a new trial on the general grounds and assigned error on the direction of a verdict. The motion was overruled and the plaintiff excepted.

1. The controlling question for determination in this case is whether the evidence raised an issue of fact for the jury as to the defendant's alleged negligence. We will therefore examine the evidence in connection with the allegations of negligence against the defendant.

(a). There was only an inference, from the fact that the collision occurred, that the engineer and the fireman failed to keep a lookout for the taxicab. Howard testified that he could not have seen the engineer and the fireman from the footboard of the tender of the locomotive where he was standing, and the engineer and the fireman testified that he was not visible to them in his position. The fireman, sitting on the north side of the locomotive, from which direction the taxicab was approaching, testified as follows, in part: "As we backed up I saw a vehicle on Second Street. The automobile was about 300 feet [away] when I noticed it. The automobile was coming south. When I first noticed it (auto) he was going 25 to 30 miles per hour. It was a dry day and I saw the dust and as it approached

the crossing it looked like he was going to slow up, but as he got to the crossing he looked like he dropped his head down and crossed the crossing. When I saw him drop his head, I hollered at Mr. Peavy (engineer) to stop. . . About 15 or 20 feet from the crossing I saw he was not going to stop and I hollered to the engineer to stop. . . I did not have the engineer throw on his brakes—not until he [the taxicab driver] got within 15 to 20 feet of the crossing. I was under the impression that he [the taxicab driver] was looking at me and I was looking right at him and there was nothing to keep him from seeing me." This positive testimony rebuts any inference of a failure of the fireman to keep a vigilant look-out for the taxicab, arising from the fact that a collision occurred.

The engineer, who was on the south side of the engine, away from the approaching taxicab, testified that he looked for automobiles approaching from the south on Second Street, saw none, and then continued to look toward the rear of the engine, in the direction it was moving. His view to the north along Second Street was blocked by the opposite side of the cab. Howard was not visible to him, and he did not see Howard's signal to stop. He testified, in part, "Dorsey Jones [the fireman] gave me the warning. He said look out for the automobile and I grabbed my engine brakes and pulled on it and the end of the car came from behind the tank [or tender], and I had hit it. I put on brakes about the same time as the crash. . . I did not see Mr. Howard at any time until after I stopped the engine." According to Howard's testimony, he was standing south of the center of the rear of the tender, on the same side as the engineer. Howard testified, "In the position I was in y o u couldn't get far enough to reach out across the end enough to give a signal to the engineer. . ." The tender was over eight feet wide, and Howard was standing between the angle cock, which was two feet from the side of the tender, and the center of the tender. As to the time when he gave the signal to the engineer, Howard testified, "It looked like he [the taxicab driver] was stopping. When I turned my head to see if anything was coming, he (taxi) was pretty close to the crossing and drifting up there and I hollered at him and waved at him and I thought I was going to get him stopped. And when

he run up and I saw that he was not going to stop, that's when I gave the signal to Mr. Peavy. . . I gave him (the engineer) the signal when I first saw the car about a car length away from the track," and "I signalled him (the engineer) when I first saw him (the taxi) about the length the taxi was from the railroad."

It is apparent that, if the plaintiff's stop signal could have been seen at all, it was given no sooner than the fireman's warning to the engineer to stop, and it was too late for the engineer to stop the locomotive before it collided with the taxicab. So, the failure of the engineer to see the plaintiff's signal had no effect on the stopping of the engine; that is, it would not have enabled the engineer to stop any quicker than he did.

(b). There was evidence that the weight of the engine and the loaded tender was 225,000 pounds. Howard testified that it travelled 30 or 40 feet after the impact with the taxicab, or about half the length of the engine and tender. According to the testimony of the plaintiff and the fireman, the taxicab was only one or two of its lengths, or about 15 or 20 feet, from the tracks when it became apparent to them that the taxicab was not going to stop. Howard's estimate of the taxicab's speed was 15 or 20 miles per hour, or about four times the speed of the engine. Thus when the plaintiff gave his arm signal and when the fireman "hollered at the engineer to put the brakes on," the engine was only one fourth as far from the point of impact as the taxicab was, or about 3 to 5 feet. A finding that the engineer was negligent in failing to stop the engine upon impact or sooner than he did could not reasonably have been reached under the evidence.

(c). With regard to the condition of the angle cock, a valve on the rear of the tender by which the air brakes of the engine could have been applied, Howard testified that it had a knot or rough place over which it had to be forced to open it, and after forcing it past that place, it could not be stopped or adjusted until all the air was applied to the brakes, as for emergency stops. He testified that in such circumstances the dangling air line with a casting on its end would have dangerously whipped about when 70 pounds of air suddenly filled it. "If you snatch it wide open it would whip you to death. If you

got time enough to hold on to the end of it and get hold of that angle cock you can apply the air from back there in that way. It would have knocked me off the engine and maybe broken both my legs. *I would not have used the angle cock on that particular day if it had been in good shape* [emphasis added]," were Howard's words. Since Howard would not have used the angle cock if it had been in working order, either because he would not have had time to do so while protecting himself and signalling with his hands, or because if he had applied the brakes as in an emergency the air line might have injured him, his own testimony shows that he did not consider the alleged defective condition of the angle cock to have any causal relation to his injury. Furthermore, the evidence of the other employees of the defendant was to the effect that the angle cock was not in a defective condition, but was working all right, and, in fact, the plaintiff admitted that he had used it on the same day he was injured.

(d) With regard to the allegation that the defendant was negligent in failing to maintain a guard or a stopgate at the crossing, the plaintiff testified as follows: "I did not flag the Second Street crossing. I performed all the duties of the ground man on that switch engine. Where it was necessary to flag a crossing I did the flagging. I have flagged the Second Street crossing, and have been over there when they had two men. There was nothing to prevent me from flagging the Second Street crossing and signalling the engine down on January 2, 1947, and I did not do it." The plaintiff was the person to whom the railroad had delegated the duty of protecting the crew at crossings, and he cannot recover for his own failure to perform a duty which might have averted his injury.

(e). As to the size of the crew furnished him, the plaintiff testified as follows: "My switching crew consisted of Engineer Peavy and Fireman Jones and myself as yard foreman. It was my normal switching crew in the Cordele yard at that time and had been for a long time prior to that. In watermelon seasons when they had lots of work to do, they would probably give me a man until that rush season was over, and the fertilizer season. It was a normal season in January and particularly on January 2, 1947, and it was not a rush season."

There was no showing that the size of the crew was insufficient to handle the work done in the yard, nor does it appear how the collision might have been averted had there been other men in the crew.

We think the evidence failed to show negligence on the part of the defendant, and consequently there was no issue of fact for the jury in this respect. The only reasonable conclusion to be reached from the evidence is that the proximate cause of the injury complained of was the negligence of the taxicab driver and of the plaintiff himself. It was alleged and proved, in fact, stipulated that the plaintiff had previously recovered a judgment against the taxicab's owner for the same injuries, in an action based upon the negligence of the driver, and the negligence of the taxicab driver was not questioned in the present action.

The plaintiff's own testimony shows that he was riding on the footboard of the tender of the locomotive in violation of a written order of the defendant's superintendent of transportation; this order, issued over six months prior to the time of the plaintiff's injury, was shown to the plaintiff, and it required him to ride on the front footboard instead of on the footboard of the tender when the locomotive was moving backwards. This order was issued to protect the defendant's employees from the kind of injury which occurred in this case, but the plaintiff failed to observe it.

The plaintiff testified that he did the thinking for the crew and had complete charge and control of the engine. His position on the tender gave him a full view of the crossing, which neither the engineer nor the fireman had. Yet he did nothing in time to stop the engine before the collision, or to prevent his injury. It also appears from the evidence that the taxicab driver drove the taxicab onto the crossing in front of the approaching locomotive, which was in plain view of him, thereby causing the collision which resulted in the plaintiff's injury. Apparently, the taxicab driver was trying to beat the locomotive over the crossing and miscalculated the essential factors necessary to do this and failed to make it in time. The defendant is not liable for injuries incurred through the negligence of the plaintiff and a third party, where there is no negligence shown on the part of the defendant and its other employees. Brady v.

Southern Ry. Co., 320 U. S. 476 (64 Sup. Ct. 232, 88 L. ed. 239);
*Tankersley* v. *Southern Ry. Co.*, 73 *Ga. App.* 88 (35 S. E. 2d,
522). It was ruled in the Brady case that "When the evidence
is such that without weighing the credibility of the witnesses
there can be but one reasonable conclusion as to the verdict,
the court should determine the proceeding by nonsuit, directed
verdict or otherwise in accordance with the applicable prac-
tice without submission to the jury, or by judgment notwith-
standing the verdict. By such direction of the trial the re-
sult is saved from the mischance of speculation over legally un-
founded claims." 320 U. S. 476, 479 (88 L. ed. 239, 243, supra).
The case of Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54
(63 Sup. Ct. 444, 87 L. ed. 610, 143 A.L.R. 967), cited and re-
lied on by the plaintiff in error, does not authorize or re-
quire a different holding under the facts of the present case from
the one here made. That case held that the congressional act
of 1908 and the amendment of 1939 thereto (45 U. S. C. A., §
54) abolish the defense of assumption of risk in this type of
case, and it was there said, "They leave for practical purposes
only the question of whether the carrier was negligent and
whether that negligence was the proximate cause of the in-
jury." 318 U. S. 54, 67 (87 L. ed. 610, 617, supra). The defense
of assumption of risk was not made or relied upon by the de-
fendant in the present case.

Code § 110-104 provides: "Where there is no conflict in
the evidence, and that introduced, with all reasonable deduc-
tions or inferences therefrom, shall demand a particular verdict,
the court may direct the jury to find for the party entitled
thereto." It was ruled in *Tilley* v. *Cox*, 119 *Ga.* 867 (2) (47 S.
E. 219): "Civil Code, § 5331 [now Code § 110-104], authoriz-
ing the court to direct the jury to find for the party entitled
thereto, where there is no conflict in the evidence, and that in-
troduced, with all reasonable deductions or inferences there-
from, demands a particular verdict, is not repugnant to the Con-
stitution of this State or that of the United States, as impair-
ing the right of trial by jury, or as depriving a party of his
property without due process of law." For rulings to the same
effect, see *Price* v. *Central of Ga. Ry. Co.*, 124 *Ga.* 899 (2) (53
S. E. 455), and *Lynch* v. *Southern Express Co.*, 146 *Ga.* 68 (3)
(90 S. E. 527).

2. Under the evidence and the law applicable thereto the trial judge did not err in directing the verdict for the defendant, or in overruling the plaintiff's motion for a new trial.

*Judgment affirmed. Felton and Worrill, JJ., concur.*