### FT. WORTH & D. RY. CO.
### v.
### PRINE.
### No. 14495.

United States Court of Appeals
Fifth Circuit.
March 26, 1954.

Rehearing Denied May 6, 1954.

James C. Sanders, Culton, Morgan, Britain & White, Amarillo, Tex., for appellant.

J. O. Fitzjarrald, Merchant & Fitzjarrald, Amarillo, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

BORAH, Circuit Judge.

This action was brought by the plaintiff-appellee, H. O. Prine, against defendant-appellant Fort Worth and Denver Railway Company under the Federal Employers' Liability Act.[1] Recovery was sought for the alleged injuries and damages sustained during the course of his employment as a member of a section crew engaged in loading rails along defendant's right of way. The case was submitted to a jury with directions to return a special verdict in the form of special written findings upon each issue of fact and pursuant to the jury findings judgment was entered in favor of the plaintiff in the sum of $37,276.88. Appealing from this judgment appellant contends that the court erred in overruling its motion for an instructed verdict and its motion for judgment notwithstanding the verdict; and alternatively, to set aside the verdict because of excessiveness or remand the case for a new trial.

The important question before us is whether there was sufficient probative evidence, with the inferences that the jury could draw from it, to support the verdict for the appellee.

At the date of the injury out of which this action arises, August 13, 1951, the plaintiff was employed by the defendant as a section hand. Such employment had extended over a period of approximately four and one-half months. At the time of the injury, defendant was engaged in track work loading old rails from its right of way to a flat car; the work train consisting of engine and two flat cars on one of which was mounted a rail loading crane powered by air from the locomotive. The air loader mechanism consists of an air cylinder, a plunger, a cable, three pulleys, a guy post, and a boom. The plunger is fitted into the air cylinder, and the cable, which is attached to the outer end of the plunger, runs through a pulley to the tip of the boom and thence to the ground. The metal boom, 28 and one-half feet in length, is attached to a 12 foot guy post at a point some five feet above the bed of the flat car. It extends outward and upward at an angle of about 30 degrees, and its tip is 16 feet above the ground. The boom itself is stationary in the sense that it will not move up or down, but it is movable manually from side to side by means of ropes which are attached to its tip. As the loader is put into operation, air from the locomotive is turned into the air cylinder, forcing the plunger back into the chamber and drawing the cable backward by the plunger until the full weight of the load is felt, after which there is a pause while more air pressure is built up in the air cylinder, and the rail is then pulled upward by the cable. When the rail alongside the car has been lifted to the level of the car onto which it is to be loaded, the boom is drawn laterally by men pulling on the boom ropes from the opposite side of the car until the rail is in position. Sufficient air is then released to lay the rail upon the bed of the car, the rail hooks are disengaged, and the rail loader is moved by the work engine when it is necessary to pick up the next rail. This loader was operated by one man, Williams, defendant's roadmaster who was in charge of the work. The rails, each of which weighed about 990 pounds, were lifted from their positions along the roadbed on both sides of the track by the boom by means of the cable and hooks. Three men were assigned to handle the boom rope on the west side of the car which was being loaded; another was required to attach the hooks to the rail and signal to Williams when it was to be raised; and two employees, including the plaintiff, were stationed on the east side of the car to handle the

1. 35 Stat. 65, as amended, 36 Stat. 291, 53 Stat. 1404, 45 U.S.C.A. §§ 51, 56.

other boom rope. In loading the rails, most of the heavy pulling was done on the west side as the cars were standing on a five inch elevated curve and the boom had a tendency to gravitate toward the low or east side of the curve.

On the morning of the accident, plaintiff was engaged in performing the duties above described, which work was entirely new to him as he had not prior to that day even as much as seen a loader of that type. When loading operations began he was assigned to one of the boom ropes and took up a position about twelve feet from the car on which the rail loader was mounted, which position was slightly to the north of and in full view of Williams. Plaintiff was not given any instructions as to the method and manner in which the machine functioned either by the three section foremen then present or by his and their superior, Williams. Nor was any instruction given as to the manner in which he should handle the boom rope save that he was cautioned to keep the rope free from grass burrs for the reason that the men were handling it with their bare hands. Work began at about 8:30 A.M. and shortly thereafter the safety chains with which the boom was equipped were adjusted to allow the boom to swing out about 20 feet from the edge of the car in order to pick up a frog. Thereafter, and at some indefinite time which might have been either before or after the accident, the safety chains were readjusted to confine the swing of the boom to two and one-half feet on either side of the car, which was the approximate distance at which the old rails were lying from the car side.

Between the hours of 10:00 and 11:00 A.M. and at a time when the rails were being loaded alternately from the west and east sides of the track plaintiff wrapped the boom rope around his waist, tied a knot in it about twelve inches from his body, and then slipped it down over his hips, all for the purpose of increasing his pulling power. Plaintiff, in the unobstructed view of Williams, continued to work with the rope looped around his body for an interval between 30 minutes and an hour. At the end of this period he remarked to Roach, his co-worker on the east side, that tying the rope made it somewhat easier to grip. To this Roach replied that it would be advisable or be a good idea for plaintiff to get loose from the rope and keep himself free from it because various things could happen to cause a man to be jerked down. After hesitating for a few seconds plaintiff began untying the rope, which then had from three to eighteen inches of slack in the line. While he was thus disengaging himself the work engine blew its whistle, indicating, so plaintiff thought, that the work train was to be moved to another rail. At that instant he looked away from the boom and in the direction of the engine, and was pulled or jerked to the ground and dragged some five to seven feet toward the car, injuring his back.[2] The evidence shows that the train was not in motion at the time of the accident but the following unusual event did occur. Immediately prior to the blowing of the whistle a rail was loaded from the west side and then contrary to the sequence in operations another rail was immediately loaded from

2. The evidence of appellee's medical expert shows that he suffered a severe and painful lumbar-sacral sprain or sprained back with a slipping or dislocation of the first and second lumbar and a fracture of the pedicles of the first lumbar; that he has marked stiffness of his back involving the lumbar spine; and marked muscle spasm, pain and tenderness over the upper lumbar spine, in particular the first lumbar vertebrae. There is further evidence that he had loss of sensation to pin pricks on the right side involving his whole leg and involving the buttocks, and on the left side involving the calf, and had an absence of reflex action which is associated with an injury to the spinal cord; and this in turn made the bladder extremely spastic and unstable and led to a condition whereby urination is extremely frequent. Appellee has lost weight, had intermittent fever, suffers constant pain, had no control over his bladder, cannot work or sleep, has dizzy spells, and is required to sleep on a board.

the same side, whereas theretofore they had been loading alternately just one rail from each side. Plaintiff was unaware of this impending operation and nothing which had happened up to that time gave him any reason to anticipate that the boom would again be moved over to the west side of the car.

The jury found in answer to special issues that defendant's roadmaster, Williams, operated the air loader outfit in such way that the crane jerked plaintiff down on the ground by means of the boom rope and such operation of the crane was negligent under the existing circumstances; that defendant in the exercise of ordinary care under all of the circumstances should have warned the plaintiff earlier than he was warned by his fellow employee that he should not keep the rope he was using wound around his body in doing his work; and that the aforementioned acts of negligence were each a proximate cause of the injuries sustained by the plaintiff. The jury also found that plaintiff's own negligence in having the rope wound around him and secured contributed to his injuries to the extent of 29.5%.

█ Appellant attacks the findings that it was negligent on the principal grounds (1) that the finding of negligence on the part of Williams is against the uncontroverted mechanical possibilities of the machine and all mathematical probability, and (2) that the master was under no obligation to warn and instruct his servant as to dangers which it claims were patent and obvious. Appellant's mechanical theory that the boom could not have jerked appellee from five to seven feet is based not upon fact but upon the assumption that the safety chains would not permit the boom to swing more than two and one-half feet from the side of the car. On the basis of this premise it is argued that if the boom did in fact swing westward from either the center of the car or the car's westward edge it would in neither instance exert a pull because of the slack in the line. This theory is based on the expression of a witness' best opinion as to the amount of slack in the line which, after all, was only an estimate and not a statement of an absolute fact concerning which there can be no dispute so as to bring into play the doctrine of absolute physical facts. However, we need not labor the point since appellant tacitly and we think rightly concedes that it may be inferred from the evidence in this record that if there was any variation in the perfectly vertical position of the loading cable over the rail to be picked up, the boom or crane would have a tendency to jerk as the cable was pulled directly over the load. There was in our view sufficient evidence to go to the jury on the question whether the defendant's roadmaster, Williams, did operate the rail loader in such a negligent manner as to cause appellee to be jerked to the ground by the boom rope. Indeed, there was positive evidence that the boom did jerk at times and since Prine did in some way get jerked to the ground it is plain enough that how he got there, and what caused it were issues of fact for the jury. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 55, 63 S.Ct. 444, 87 L. Ed. 610.

█ As to appellant's second specification of error we think the evidence was sufficient to support the jury findings that appellant should have warned appellee earlier than he was warned by his fellow employee that he should not keep the rope he was using wound around his body in doing his work, and its failure to do so was a proximate cause of appellee's injuries. Appellee was a new hand on the job and prior to the day in question had never seen a loader of this type in operation. Yet he was assigned to the boom rope and given no instructions either as to his duties or as to the manner in which the machine was to be operated but on the contrary was left to his own devices to determine by observation when, by whom, and to what extent the boom was to be moved. Williams, appellant's roadmaster, was in charge of the entire operation and he

was in a position where he could observe appellee at all times and though he had no recollection of having seen appellee with the rope around his body he did state unequivocally that there was danger in permitting a person to so use the rope. Furthermore, Williams was in a position to know that a second rail was to be loaded on the west side after the engineer sounded the whistle and having such knowledge the jury could rightly conclude that it was possible to avoid all danger at that time by some warning that there was to be a change in the sequence of operations. Had this simple expedient been adopted, the accident would doubtless not have occurred and the jury under a proper charge from the court so found.

The assignment of error that the verdict is excessive is without merit.

For the reasons stated, the judgment of the District Court is

Affirmed.