Bertie Mae EDWARDS, Plaintiff,

v.

The NEW YORK CENTRAL RAILROAD COMPANY, a corporation, Defendant.

Civ. A. No. 1588.

United States District Court
S. D. West Virginia, Charleston Division.

Oct. 31, 1955.

R. G. Lilly, of Lilly & Lilly, Charleston, W. Va., for plaintiff.

Robert H. C. Kay, Charleston, W. Va., for defendant.

BOREMAN, District Judge, sitting by special designation.

This is an action brought under Title 45 U.S.C.A., known as the Federal Employers' Liability Act, Section 51 of which provides, in effect, that every common carrier by railroad shall be liable in damages to any person suffering injury while he is employed by such carrier for such injury resulting by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, road bed, works, boats, wharves or other equipment.

The plaintiff, on May 17, 1952, and for some time prior thereto, was an employee of the defendant. The gist of the complaint is that on and prior to May 17, 1952, the "defendant negligently failed to use reasonable care to furnish the plaintiff a reasonably safe place in which to work, but, on the contrary, negligently permitted a defective, unsafe and insecure screen door to remain at one of the entrance ways into said building where plaintiff worked as aforesaid; that on the night of May 17, 1952, while in furtherance of her employment as aforesaid, plaintiff had occasion to use said entrance way where said defective screen door was located, and while so using said entrance way, said screen door was caused and permitted to strike against the plaintiff and cause her to fall, thereby seriously, painfully and permanently injuring the plaintiff".

The building in which the plaintiff was working at the time of her accident is a combination passenger and freight station at Institute, West Virginia. The building is of brick construction. The tracks of the defendant run in a general easterly and westerly direction, and the front of said building parallels said tracks on the southerly side thereof, thus facing in a northerly direction. There is a doorway leading into the building from the station platform on the northerly side and, on the southerly side of the building, directly opposite said door-

way, another doorway leads into an area used on occasions by the plaintiff and other employees of the defendant as a parking space for their automobiles. There were windows on both sides of the building.

The plaintiff, a rather large woman 53 years of age, had been employed by the defendant since 1943 and, for approximately two years prior to the accident of which she complains, had been working in the defendant's station at Institute as a telegraph operator. There being no other convenient form of transportation from the plaintiff's home to her place of employment, she was accustomed to drive her own automobile to and from work, which she parked at the rear or on the south side of the building while she was attending to her regular duties. She went from the parking area into the building by way of the rear or southerly door.

On Saturday, May 17, 1952, the plaintiff's hours of employment were from four o'clock in the afternoon until midnight and, sometime between the hours of nine and ten o'clock, the plaintiff noticed the approach of a heavy wind and rain storm. At that time, the windows and doors of the building were open but screen doors had been installed in all the doorways.

In order to prevent the strong wind from blowing papers from her desk, plaintiff closed the windows and then went out the rear doorway to her car for the purpose of raising the car windows and protecting the interior of the car from rain. After she closed the car windows, just as she was about to re-enter the building by the rear doorway, a strong gust of wind blew through the doors from the northerly side of the building and blew the screen door, which opened outward toward the parking area, against the plaintiff and caused her to fall backward to the ground.

On May 15, 1952, just two days before the accident, the window screens and the screen doors in the building had been installed for the approaching summer season by D. L. Byer, a carpenter em-

ployed by the defendant. These screen doors were of the type generally used on public buildings, perhaps somewhat heavier and more substantial than screen doors in general use on dwelling houses. The door which struck the plaintiff is approximately three feet wide, about seven feet and four inches high, the frame work being made of poplar wood 3¾ inches wide and about 1⅜ inches thick. The lower portion of the door is a wooden panel which extends upward more than one foot from the bottom of the door, but this is true of the other screen door on the northerly side of the building.

When these screen doors were originally installed several years before the accident, each door was fitted with a diagonal coil spring, not connected with the hinges, one end of the spring being attached to the frame of the door and the other end attached to the frame of the doorway. There was evidence to the effect that the rear screen door was blown open and backward by a heavy wind storm in the summer of 1951, cracking the frame of the door, but that it was repaired by the witness, A. C. Hall, who was the Agent at Institute until his retirement in August of 1951. It was testified that the door worked satisfactorily after such repairs.

These screen doors were intended only to keep flies and insects out of the building and it was customary that the doors were taken down before each winter season and were installed again the following spring. When the carpenter installed the screen doors in May 1951, he found the coil spring on the rear door broken and he removed it. Instead of replacing the coil spring with a new one, he removed the old door hinges and hung the door by the use of three new spring hinges which provided the same tension as the original coil spring and held the door closed under normal conditions.

On the inside of this particular doorway, there was a device by which the door could be hooked shut by anyone from the inside. A metal band strap was attached to the outside of the door frame to be used by persons desiring to open the door from the outside. The floor of the building was several inches, or one step, above the level of the ground. When the inside fastener on the screen door was unhooked, the door remained closed under normal conditions because of the strong hinges. Obviously, before the plaintiff left the building to go to her parked car, it was necessary to unhook the screen from the inside.

The plaintiff's counsel, in argument and briefs, contends that "the type of door, with the absence of a latch and stop or other proper mechanism, and the defective condition of the door, constituted negligence on the part of the defendant in failing to use reasonable care to furnish the plaintiff a reasonably safe place in which to work, and that such negligence, in whole or in part, caused or contributed to plaintiff's injuries". Plaintiff's counsel stated the plaintiff's theory of recovery thus: "While it is true that the plaintiff would not have been injured except for the screen door being blown open by the wind on that evening, * * if the defendant had used reasonable care to furnish a reasonably safe screen door, it would have withstood the effect of the wind and plaintiff would not have been injured".

The evidence disclosed that the prevailing winds at the point of accident are from the southwest and would normally blow against the rear screen door, tending to keep it closed. Storms usually come from that same direction. On the evening of May 17, 1952, the storm, with accompanying rain and high winds, approached from the north. The windows had been closed on the north side of the building and the wind swept through the front screen door and through the building against the inside of the rear screen door, causing it to be blown open just as the plaintiff was returning from her parked car and about to re-enter the building.

There were no eyewitnesses to the accident and no one testified concerning the storm except the plaintiff herself, who described it as "pretty much of a storm". There was some effort to introduce evidence of the reported wind velocity at the Charleston Airport from records kept by the Weather Bureau at that point. However, the Airport is located on a very high hill some ten air miles or more from, and to the northeast of, Institute, with hills, valleys and a river between the two points. The Court did not believe that such evidence would be pertinent or should be considered as indicating the wind velocity at the place of accident, which is in low lying lands and almost totally unprotected by hills on either the north or south.

■ The first consideration must be directed to the plaintiff's charge of negligence on the part of the defendant. We begin with the proposition that the defendant is not an absolute insurer of the safety of its employees, including the plaintiff. In Wilkerson v. McCarthy, 336 U.S. 53, 61, 69 S.Ct. 413, 417, 93 L. Ed. 497, rehearing denied 336 U.S. 940, 69 S.Ct. 744, 93 L.Ed. 1098, the Court said: "Much of respondents' argument here is devoted to the proposition that the Federal Act does not make the railroad an absolute insurer against personal injury damages suffered by its employees. That proposition is correct, since the Act imposes liability only for negligent injuries. Cf. Coray v. Southern Pac. Co., 335 U.S. 520, 69 S.Ct. 275 [93 L.Ed. 208]. But the issue of negligence is one for juries to determine according to their finding of whether an employer's conduct measures up to what a reasonable and prudent person would have done under the same circumstances. And a jury should hold a master 'liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances', bearing in mind that 'the standard of care must be commensurate to the dangers of the business.' Tiller v. Atlantic Coast Line R.

Co., 318 U.S. 54, 67, 63 S.Ct. 444, 451, 87 L.Ed. 610".

In Note 436 of Title 45 U.S.C.A. § 51, it is stated: "Under this chapter, the mere happening of the accident will not warrant a recovery; there must be negligence on the part of the railroad company or on the part of some employee, as this is the basis of liability." A long list of cases is then cited. Then follows: "This chapter does not make the employer the insurer of the safety of his employees while they are on duty, but makes the basis of the employer's liability his negligence, not the fact that injuries occur, and his negligence must in whole or in part be the cause of the injury." Then follows a citation of other cases.

Certainly a screen door is not, in itself, an inherently dangerous instrumentality. It was placed, along with other screen doors and window screens, to guard against the entry of insects into the building, thus contributing to the comfort and the protection of the health of the plaintiff and the other employees in the defendant's station. According to the evidence, there was nothing unusual in the type of screen door and it was testified that the door was the kind ordinarily used in public buildings and built to withstand usage to which the ordinary screen doors installed in dwellings are not exposed. Certainly there was no negligence on the part of the defendant in providing a screen door of that type. Wherein, then, does the negligence of the defendant lie?

The plaintiff says the defendant should have provided a "latch and stop or other proper mechanism". Suppose the door had been held closed by the ordinary latch with a knob on either side. For the plaintiff to enter the building after leaving her car, she would have turned the knob and released the catch, thus leaving the door exposed to the violent wind currents. Could anyone say that such a catch would have prevented the accident?

It is not clear as to the nature of the "stop" to which the plaintiff refers. It

is a matter of common knowledge that many doors are equipped with stops which are designed to prevent them from closing too quickly behind some one who has entered, or to eliminate the noise of slamming when the door closes from the force of the springs or spring hinges. These stops are not intended to interfere with the opening of the doors to which they are attached but only to control the closing action. How could the installation of such a stop have prevented the accident? There is no evidence or indication as to the plaintiff's criticism concerning the failure to install "other proper mechanism".

Next we come to the "defective condition of the door". As was stated before, sometime in 1951 the screen door had been blown open and the door frame was cracked or split, but it was repaired by an employee of the defendant. Only one witness testified that the door never did work properly but there was abundant and preponderating evidence that the door worked satisfactorily after it was repaired. No one testified that the tension of the three spring hinges was any less than the tension of the single coil spring. Several witnesses, including the carpenter who made the installation, testified that the tension was the same.

It was further testified, and not contradicted, that if a greater tension had been placed on this screen door, the tendency would have been for the door, when opened, to close too rapidly, possibly injuring persons who either worked there or had occasion to go there on business, as they made the step into the waiting room.

Great stress is laid by the plaintiff upon the fact that there was a crack in the door and that the door had been repaired with nails. Repairing a screen door is not a particularly complicated and technical operation. Witness Hall said he did a satisfactory job and that thereafter, during his continued employment, the door worked satisfactorily. Witness Byer, the carpenter who installed the screen door on May 15, 1952, said it worked satisfactorily. This installation of the screen doors in the spring was a part of his assigned work. The door remained in service continuously the rest of that summer and worked satisfactorily, according to several witnesses.

At the time of the plaintiff's accident on May 17, 1952, the screws did not come out of the hinges of the door, the hinges did not come off of the door and the door was not detached in any way from its fastening. The screws and the hinges remained the same as they were when installed by the carpenter.

One witness, Leonard Taylor, testified that two or three months before the accident, the screen door did not work properly and that the lower spring hinge was broken. Evidently Mr. Taylor was mistaken in two respects: (1) The screen door was not installed until two days before the accident; (2) the spring hinge mentioned by the witness was produced in court as an exhibit and it was obvious that the spring was not broken. When the alleged negligence of the defendant in permitting the door to remain in use with a broken spring was removed from the case by the introduction into evidence of the spring hinge itself, the plaintiff then emphasized the claim that the door had cracks in it where the spring hinges were attached. However, after the repairs to the door had been made in 1951, these cracks did not permit the screws to come out when the door was blown open and against the plaintiff on May 17, 1952.

The plaintiff charged the defendant with breach of a duty to inspect this door and to maintain it in proper working condition. The defendant employed a carpenter, Mr. Byer, who had been doing this type of work for the defendant for a number of years, and there is no evidence that he was incompetent. The defendant had a right to assume that he would do the job assigned to him in a workmanlike manner. He installed the door himself; he saw that it worked; he tried it out and it was working satisfactorily when he left. That was two days before the plaintiff's accident. There was no evidence, between the date of the

installation of the door and the time of the accident, that anything had happened to the door or to call the defendant's attention to any defect therein or in its operation. The plaintiff did not observe any defects in the door or in its manner of operation and she used it during that two-day period. None of the other witnesses who were called testified that he or she observed anything wrong with this screen door before or after the plaintiff's accident. Certainly there was no duty on the part of the defendant to inspect a screen door every day after it had been installed by a competent carpenter, the defendant having had no notice as to any defect or that there was anything wrong with the door's operation. All of the witnesses (except Leonard Taylor), including the plaintiff, observed nothing wrong with the screen door from the time it was installed on May 15, 1952, until it was taken down in the autumn of that year.

Plaintiff's counsel, in his memorandum, stated: "We do not contend that the fact that the door blew open, resulting in injury to the plaintiff, is in itself sufficient to impose liability on the defendant". It appears from the evidence that the wind caused the door to come open, striking the plaintiff, but the opening of the door at that particular moment was not due to the condition of the spring hinges. The plaintiff herself did not anticipate that the door would blow open as she was about to enter it, although the storm was in progress. How could the defendant have anticipated that an employee would go out in a storm to close the windows in her car and, at the exact moment she attempted to re-enter the building, that the door would blow open?

The plaintiff contends that the door had blown open on previous occasions and that these previous happenings indicated that the door was defective but, as the Court recalls the evidence, the door was caught by the wind and blown open on only one occasion before May 17, 1952, and that was in the year previous. The circumstances surrounding the opening of the door on that occasion were not shown except that the door was blown open by the wind.

There is nothing in the record to indicate that if this screen door had been new, installed on the day of the accident, with the same spring hinges on it or a coil spring exactly like the ones on the doors on the other side of the building, it would not have blown open just as this door blew open. The door was not defective. The tension on it was the same as on the other doors and any greater tension would have created a dangerous situation by causing the door to close too rapidly, perhaps catching the ankle or heel of anyone entering through that doorway and causing injury.

There was some conflict in the testimony as to the exact nature, extent and cause of the plaintiff's alleged injuries, but consideration of this testimony is unnecessary. The fact that the plaintiff suffers physical pain naturally arouses a feeling of sympathy and the hope that she may fully recover, but these are matters which cannot be permitted to influence the decision in this action.

██ The law is too well settled to require the citation of authorities to the effect that the burden is on the plaintiff to prove, by a preponderance of the evidence, that the negligence of the defendant proximately caused or contributed to the plaintiff's injuries. The Court, after considering the cases cited by both the plaintiff and the defendant, concludes that the plaintiff has failed to carry the burden of proof and that there is no persuasive evidence which would support a finding in her favor.

The foregoing will be adopted as containing the Court's findings of fact and conclusions of law. Counsel for defendant is directed to prepare and submit an order consistent with this opinion.