ROBERTSON, Justice:
Rosebud Williams, a male, sued the Mississippi Export Railroad Company in the Circuit Court of Jackson County under the Federal Employers’ Liability Act for injuries sustained by him on April 10, 1968, when he tripped over a banding wire while unloading railroad crossties from a gondola car. The jury returned a verdict for $50,000.00 and the Railroad Company appeals.
Plaintiff testified that he began work for defendant as a section laborer on December 16, 1952; that he had been working for defendant about 16^ years when he was retired because of sinus trouble and a degenerative back condition. Prior to working for defendant he had worked as a section laborer for the Columbus-Green-ville Railroad Company, Gulf Mobile and Ohio Railroad Company and Southern Pacific Railroad Company.
One of his regular duties was unloading crossties. On April 10, 1968, along with 4 other section crewmen, he began to unload regular creosoted crossties from a low-side gondola car, which is an open car with sides about four feet high. There were 383 crossties in this gondola car. They were bound together in lots of twelve with metal bands or wires, and it was the duty of the crewmen unloading them to cut these metal bands so that the crossties could be unloaded one by one.
Robert Smith and plaintiff were working as a team in the north end of the gondola car, and Leroy McMillian and Chambers White were working in the south end. Rosebud testified that he and Smith had a cleaver and a maul with which to cut the banding wires. Smith testified that he held the cleaver while Rosebird wielded the maul in cutting the metal bands binding the crossties. The procedure for unloading was for Smith to pick up one end of the 160-pound crosstie and place it on the side of the gondola car. Rosebud would pick up the other end and slide it over the side of the railroad car.
Rosebud testified:
“While unloading the ties — there’s band strapping in the car, I don’t know whether it was a piece of wire, or one of the bands — Nevertheless, the ties was piled on the other end of them, and some of them was down under my feet. And I begun to run and sheve (sic) the tie off, and it caught me, caught my left leg and throwed me down in the car against some more ties, on my left side. And Robert, being with me, caught the tie.”
Plaintiff complained to his fellow workers that he had hurt his back but he continued to work for the rest of the day. On the morning of April 11, he reported to his *30 section foreman, W. O. Carpenter, that he had injured his back. Carpenter sent him to Thompson’s Clinic at Moss Point, where he was examined by Dr. Forrester. T. M. Von Sprecken, Jr., Vice-President and General Manager of Defendant, was called as an adverse witness by plaintiff and testified that the report from Thompson’s Clinic was: “Sacro-sprain, and okay to go back to work on Monday, the 15th.”
On April 15th, Rosebud returned to his regular job and worked in the same manner that he had in prior years.
He testified that he again injured his back in the same place about September 18, 1968, when in going to a grocery store near his place of work he jumped a ditch and twisted his back. He was 59 years of age at this time and had been working as a section hand for 24 years. On September 20th, he was sent to the hospital for x-rays.
Dr. Roberts of Thompson’s Clinic testified :
“Yes, the X-ray report says cervical spine shows degenerative disease, cervical vertebral body degenerated, C-6 and -7, cervical 6 and 7; lumbar spine showed degenerative disease, lumbar vertebral bodies, discs, narrowing at L-5 and S-l level, the fifth lumbar and the first sacral level.
“Q All right, sir. Now, that’s degenerative disc disease that you’re talking about ?
“A Yes, sir.
“Q Then, Doctor, when was he returned to work; does your record show that is as a result of—
“A The September episode.
“He was seen again by Dr. Thompson on the 2nd of October. And the entry here says ‘X rays, change consistent with degenerative disease,’ aging. Able to return to work October 2nd.”
Dr. Roberts further testified, without objection, as to an October 11, 1968, written report to Von Sprecken:
“This was written by Dr. Thompson. He had seen him at the time he was in the hospital and had his X rays made. The patient, in my opinion, has only an involvement in keeping with his age. However, in his type of work, it would be continuously bad on this condition. If he were being hired to new employment, it would probably be the same type of work. It’s my opinion that this man can continue to work on his present job, keeping in mind that at an early time the degenerative process will proceed at a normal rate.”
Dr. Roberts made another written report on April 16, 1969. He stated from the witness stand:
“Let’s see. The above patient was examined by me on April 14, ’69. After examining this patient and reviewing the X rays, I note the degenerative diseased bodies, and degenerative discs C-6 and -7 level, which means degenerated cervical and lumbosacral spine, minimal narrowing at the L-5 and S-l level, due to the type of disease of the cervical spine. It is my opinion he should be retired.”
Plaintiff testified that he made a claim for Railroad Retirement Disability Benefits in April, 1969, and that he sent in Dr. Roberts’ statement in support of his claim.
He was cross-examined about this:
“Q Well, his is the one that started the benefits, isn’t it, the statement that he prepared and you sent in to the Railroad Retirement Board?
“A He wasn’t the one that started the benefits, ’cause when I started drawing it, I got off sick for something else.
“Q What were you sick with ?
“A Something like the flu. In other words, it was sinus trouble.
“Q It was sinus trouble that you had?
“A That’s right; and I started drawing from there.
*31 “Q So, that is what you started the benefits on, was your sinus trouble ?
“A Right.”
Rosebud testified that his retirement pay was $154.00 every two weeks.
Plaintiff filed suit on June 24, 1970. In his declaration he alleged:
“Plaintiff would further show that while attempting to unload the ties at the instruction and direction of the said W. O. Carpenter with inadequate and insufficient help, he was caused to severely, painfully and permanently injure his low back when he tripped over a banding wire while lifting one of the ties, causing him to fall on other ties in the car, severely, painfully and permanently injuring his low back.”
Plaintiff charged the railroad company with negligence and carelessness “in failing and neglecting to furnish the Plaintiff with an adequate and sufficient number of co-workers to perform the work, and further by reason of the negligence and carelessness of the Defendant through its Section Foreman, W. O. Carpenter, in directing and instructing the Plaintiff and his co-workers to handle the work of unloading the crossties in an unsafe method or manner by directing that only two workers handle each tie when the said agent and employee of the Defendant knew, or through the exercise of reasonable care [should have known that this was] an insufficient number of employees to safely handle the said crossties, and by the further negligence and carelessness on the part of the Defendant in failing to exercise reasonable care to furnish the Plaintiff with a safe place to work by suffering, allowing and permitting the maintenance and existence of the loose steel tie bands in the gondola car where the Plaintiff was required to work, ...”
According to the Plaintiff, each crosstie weighed 350 to 400 pounds. Plaintiff was asked by his counsel:
“What’s the normal number of men to be used in handling crossties of this weight ?” (Emphasis added.)
To which, plaintiff responded:
“To do it safely, four men.”
W. O. Carpenter, the section foreman, testified that these crossties weighed 160 pounds each, and later Robert Smith and Leroy McMillian testified that they actually witnessed the weighing of these regular crossties and they weighed 160 pounds each.
As to the usual and customary manner in which regular crossties were unloaded, Smith testified:
“Q Was that the usual and customary manner in which you unloaded ties?
“A Yes, sir, the only way you unloaded ’em.
“O So, have you ever known of Mr. Carpenter, or any of the section crew, to use four men?
“A No, sir. When I started in, all zve used ivas tzvo.
“Q That’s all you ever used, isn’t it?
“A Yes, sir. If Mr. Carpenter used four men, it .would have to be a switch tie, which is a great long one.
“Q And you can’t put one of those sideways in a gondola like the one you were unloading?
“A No, sir.”
(Emphasis added.)
Smith further testified as to his work with Plaintiff:
“Q How was the work divided up ? Tell the Court and Jury what you all do, Robert, and how it happened.
“A We was unloading some crossties. He was tailing; I was putting ’em up, and he had to push 'em out. And he tripped over a bail wire.”
*32 “Q Now, Robert, on the date that you were there, and you were unloading these ties, were they strapped ?
“A Yes, sir.
“Q The ties were strapped when you got there?
“A Yes, sir.
“Q Who broke the straps on those ties?
“A Me and him.
“Q How did you break the straps?
“A Took a maul, laid it down, and beat it up against there to break it.
“Q Did he do the beating, or did you?
“A He did the beating.”
The United States Supreme Court in Tiller v. Atlantic Coast Line Railroad Company, 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967 (1943), outlined the standard to be used in FELA cases:
“In this situation the employer’s liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done. A fair generalization of the rule is given in the Senate Committee report on the 1939 amendment: ‘In justice, the master ought to he held liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances.’ Of course in any case the standard of care must be commensurate to the dangers of the business.” (Emphasis added.) 318 U.S. at 67, 63 S.Ct. at 451, 87 L.Ed. at 617, 143 A.L.R. at 974.
In Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the United States Supreme Court said only slight negligence on the part of the defendant need be proved. But even that degree of negligence must be proved by a preponderance of the evidence. This the plaintiff failed to do. Plaintiff did not prove that defendant was guilty of any negligence whatsoever.
The evidence was uncontradicted that plaintiff was an experienced railroad section hand; in fact, he himself testified that he had had 24 years experience in this work. The proof was undisputed that new creosoted crossties came banded together with metal bands or wire. The crew members were solely responsible for cutting these metal bands and getting them out of the way. Plaintiff claimed that he was injured when he tripped over a cut banding wire. Robert Smith, plaintiff’s working companion, testified that plaintiff actually wielded the maul that broke the banding wire. Plaintiff cannot recover from his employer for injuries caused solely by his own negligence. It was his duty, and his alone, to cut and remove the banding wire. This he failed to do. It was his negligence that caused his injuries. Neither the weight of the crosstie nor the number of workmen handling it had anything whatsoever to do with the plaintiff tripping over a banding wire that he had carelessly left on the floor of the gondola car.
Even under the stringent rules of FELA, the defendant was entitled to a peremptory instruction. There was no proof whatsoever that the defendant was guilty of even the slightest degree of negligence.
The judgment is, therefore, reversed and judgment rendered here for the defendant.
Reversed and rendered.
GILLESPIE, C. J., and JONES, IN-ZER and SUGG, JJ., concur.